**GENERAL MOTORS CORPORATION, PONTIAC MOTOR DIVISION, Appellant,**

v.

**COURTESY PONTIAC, INC., a corporation, Appellee.**

No. 951.

Court of Civil Appeals of Texas, Tyler.

May 27, 1976.

Rehearing Denied June 24, 1976.

Charles F. Potter, Potter, Lasater, Guinn, Minton & Knight, Tyler, for appellant.

Jack Norwood, Holcomb & Norwood, Tyler, for appellee.

DUNAGAN, Chief Justice.

This is an appeal by General Motors Corporation, Pontiac Motor Division, defendant, from an order overruling its plea of privilege. Hereafter, the appellant will be referred to as "General Motors" and the appellee as "Courtesy Pontiac." This suit was brought by Courtesy Pontiac against General Motors in the Seventh Judicial District Court of Smith County, Texas, alleging fraudulent representations made in Smith County, Texas, by the agents, servants and employees of General Motors. Courtesy Pontiac further alleged that it relied on these fraudulent representations and prayed for actual damages in the sum of $7,100, together with exemplary damages in the sum of $25,000.

General Motors timely filed its plea of privilege to be sued in Dallas County, Texas. This plea of privilege was controverted by Courtesy Pontiac under subdivisions 7 and 27, Tex.Rev.Civ.Stat.Ann. art. 1995. However, Courtesy Pontiac conceded in the Trial Court that subdivision 27 was inapplicable and relied solely on subdivision 7. After a hearing, the Trial Court entered its order overruling the plea of privilege. Ap-

peal therefrom has been timely perfected to this Court.

Courtesy Pontiac is an automobile dealer which operates in Tyler, Texas, under a written Sales and Service Agreement with General Motors. This controversy arose out of the Demonstrator and Fleet Incentive Program[1] set forth in letters and attachments thereto from the General Sales Manager of General Motors. These letters and attachments were sent to all Pontiac dealers on March 12th and 13th, 1974. They provided for incentive payments on Pontiac motor vehicles which met the following requirements:

(1) The vehicles must have been new and unused 1974 models when placed in demonstrator service.

(2) The vehicles must have been produced prior to March 12, 1974.

(3) The vehicles must have been placed in demonstrator service by the dealers after March 12, 1974, and prior to June 30, 1974.

(4) The vehicles must have been retained in such service for a minimum of 90 days.

The Sales and Service Agreement provided as follows:

" . . . no agreement between the parties which is at variance with any of the provisions of this Agreement or which imposes definite obligations upon either party not specifically imposed by this Agreement . . . shall be binding upon either party *unless it bears the signature of the General Sales Manager of Pontiac Motor Division of General Motors Corporation* . . . ." (Emphasis added.)

Carl Westcott, the President of Courtesy Pontiac, testified that he read both letters and "examined the Dealer Demonstrator and Fleet Incentive Program very carefully . . . to see if it was of possible use" to Courtesy Pontiac.

---

1. The apparent purpose of the incentive program was to increase the sale of automobiles by providing dealers with rebates on vehicles which were used as demonstrators, thus permitting the dealers to sell these demonstrators at a reduced price.

Courtesy Pontiac's suit is based on allegations that the agents of General Motors represented to Westcott that sixteen (16) of Courtesy Pontiac's automobiles were eligible for the rebate when in fact they were not.

General Motors, in its first two points of error, contends that the trial court erred in overruling its plea of privilege because (1) no exception to exclusive venue in Dallas County has been shown and (2) there is no competent evidence that General Motors committed fraud in Smith County, Texas, so as to confer venue in such county under subdivision 7 [2] of Art. 1995. In determining this "no evidence" point, we look only at the evidence and the inferences therefrom which are favorable to Courtesy Pontiac. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas.L.Rev. 361, 364 (1960).

On March 28, 1974, A. C. Huckelbury, the Assistant Zone Manager for General Motors, and Don DeLo, the District Manager for General Motors, met in Tyler, Texas, with Carl Westcott. The Demonstrator and Fleet Incentive Program was discussed during this meeting. Prior to the meeting in Tyler, Westcott had not enrolled any cars in the program. Although Courtesy Pontiac had twenty (20) cars in demonstrator service, Westcott did not think any of these cars were eligible for the rebate. During the meeting, DeLo said that his records indicated that Courtesy Pontiac had only three (3) demonstrators in service. An inquiry of Ms. Barr, an employee of Courtesy Pontiac, revealed that many of Courtesy Pontiac's automobiles which were then in demonstrator service had not been "registered" with General Motors.

General Motors has, since 1970, required a dealer to notify the manufacturer when an automobile is placed in demonstrator service. IBM cards for that purpose were furnished to the dealers and were to be returned to General Motors. This "registration" informs General Motors as to the number of new and unused cars a dealer has on hand and facilitates the proper distribution of new cars.

Westcott testified that Huckelbury told him on March 28, 1974, that those cars which were actually in demonstrator service but which had not been registered with General Motors were eligible for the Demonstrator Incentive Program. The IBM cards on such unregistered demonstrators were completed that day and were given to Huckelbury who returned them to the zone office of General Motors in Dallas, Texas. Pursuant to other provisions of the Demonstrator Incentive Program, Courtesy Pontiac made written applications on April 2, 1974, and May 21, 1974, for rebates on a total of twenty-seven (27) automobiles. Also following the procedure outlined in the program, credit of $12,000 was automatically given to Courtesy Pontiac for all cars listed, subject to cancellation after an audit by General Motors as provided for in the letters of agreement. These cars were subsequently sold at a reduced price. The audit by General Motors showed that the information certified to by Courtesy Pontiac regarding sixteen (16) of the automobiles was incorrect and that the cars were not eligible. On September 19, 1974, General Motors notified Courtesy Pontiac that a rebate in the sum of $7,100 theretofore credited to Courtesy Pontiac on those sixteen (16) demonstrator automobiles had been disallowed. Courtesy Pontiac does not question the accuracy of the auditor's report showing the ineligibility of the sixteen (16) automobiles. It was stipulated at the hearing that the auditor's report was true and correct. This suit was instituted on the theory that Courtesy Pontiac relied on and was damaged by Huckelbury's misrepresentation of eligibility. General Motors contends that there was no evidence of fraud by General Motors because Huckelbury had no actual or apparent authority to modify the eligibility requirements of the demonstrator program.

---

**2.** "7. Fraud and defalcation.—In all cases of fraud . . . suit may be brought in the county where the fraud was committed or where the defalcation occurred, or any of such suits may be brought where the defendant has his domicile."

The letters of March 12th and 13th, 1974, in conjunction with the Sales and Service Agreement, clearly provide that any modification of the plan would be upon and after written notice by *Pontiac Motor Division of General Motors Corporation to the dealers and then, only by the General Sales Manager.* There is no evidence, and Courtesy Pontiac does not contend, that Westcott was unaware of this limitation upon the authority of the agents of General Motors to waive or alter any provision in the Demonstrator Incentive Program. "It is well settled that one dealing with an agent, and knowing his lack of authority to act for his principal in making given representations, cannot set up the falsity of the representations as a ground for a recovery of damages of the principal." *L. D. Powell Co. v. Sturgeon,* 299 S.W. 274 (Tex.Civ.App.-Texarkana 1927, n. w. h.) and cases therein cited. "Notice of limitations upon the agent's authority to waive or alter the contract may be given by the terms of the contract itself and will be effective." *Kasch v. Williams,* 251 S.W. 816 (Tex.Civ.App.-San Antonio 1923, n. w. h.). We find no evidence of probative force in the record to support any contention that Huckelbury had actual or apparent authority to alter or modify the terms of the Demonstrator Incentive Program.

Courtesy Pontiac also argues "that the statements made by Mr. Huckelbury were an 'interpretation' of the eligibility requirements of the program, and not a variance of the written terms of the program itself." The provision that only new and unused cars were eligible for the rebate was clearly set out in the letters of March 12th and 13th, 1974. Therefore, call it what you may, the statements attributed to Mr. Huckelbury which were contrary to the provision of the Demonstrator Incentive Program could only have been a modification of that program.

In Prosser on Torts 3rd Ed., sec. 103, p. 731, we find this statement:

"Not only must here be reliance, but the reliance must be found to be justifiable under the circumstances. . . .

But in some cases where the plaintiff's reliance in fact, and his good faith, are unquestioned, it may still be held that his conduct was so foolish as to bar his recovery. If he is a person of normal intelligence, experience and education, he may not put faith in representations which any such normal person would recognize at once as preposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth, and still compel the defendant to be responsible for his loss."

We believe this rule of law is applicable to the facts in this case as Westcott well knew that the statements attributed to Huckelbury were completely contrary to the requirements outlined in the agreements. Since Courtesy Pontiac's reliance was not justified under the circumstances existing here, it follows that one of the necessary elements of its cause of action for fraud was not established.

■ The general rule of venue is that a defendant must be sued in the county of his domicile. In order to defeat defendant's plea of privilege to be sued in the domiciliary county, the burden is on the plaintiff to allege and prove by a preponderance of the evidence that the case comes within one of the exceptions to Tex.Rev.Civ.Stat.Ann. art. 1995. *Admiral Motor Hotel of Texas, Inc. v. Community Inns of America, Inc.,* 389 S.W.2d 694 (Tex.Civ.App.-Tyler 1965, n. w. h.); *Compton v. Elliott,* 126 Tex. 232, 88 S.W.2d 91 (1935); *Berry v. Pierce Petroleum Corporation,* 120 Tex. 452, 39 S.W.2d 824 (1931).

■■ Venue facts must be proved just as the allegations of any plea or in the usual way in which proof is required by the party upon whom the burden of proof rests. *Victoria Bank & Trust Co. v. Monteith,* 138 Tex. 216, 158 S.W.2d 63 (1941). In a venue hearing the plaintiff has the same burden of proving a cause of action as on a trial on the merits; a prima facie case is not sufficient. *Compton v. Elliott,* supra; *Lynch v. Millican,* 304 S.W.2d 410, 412 (Tex.Civ.App.-

Waco 1957, n. w. h.); *Young v. Young,* 340 S.W.2d 521 (Tex.Civ.App.-Waco 1960, n. w. h.).

 The burden imposed upon Courtesy Pontiac is one the courts have predicated upon the belief that the defendant's right to be sued in a county of his domicile is an invaluable right and this right should be vitiated only when the evidence clearly supports the maintenance of venue in some other county. The right to be sued in one's own domicile is a right jealously guarded by the courts and exceptions to the venue statutes must clearly appear. *Goodrich v. Superior Oil Company,* 150 Tex. 159, 237 S.W.2d 969, 972 (1951); *Burtis v. Butler Bros.,* 148 Tex. 543, 226 S.W.2d 825 (1950). Unless the plaintiff clearly discharges his burden by proof, the defendant is entitled to have the case transferred to the county of his domicile. *Calhoun v. Padgett,* 409 S.W.2d 890, 893 (Tex.Civ.App.-Tyler 1966, n. w. h.); *Reynolds & Huff v. White,* 378 S.W.2d 923 (Tex.Civ.App.-Tyler 1964, n. w. h.).

Plaintiff must produce extrinsic evidence sufficient to establish the allegations in his petition by a preponderance of the evidence. This requirement is supported by considerations of public policy grounded upon the premise that otherwise it would be too easy by mere allegations and statements of conclusions to defeat the defendant's right to be sued at his domicile. *Ideal Baking Co. v. Boyd,* 417 S.W.2d 613, 617 (Tex.Civ.App.-Tyler 1967, n. w. h.); 1 McDonald, Texas Civil Practice, sec. 4.55(b) at 612, 613. Venue may not be established by implication. *Reynolds & Huff v. White, supra.*

 The appellee has failed to discharge the burden required of it to hold venue in Smith County.

The judgment of the Trial Court is reversed and the cause is remanded to the Trial Court with instruction that the cause be transferred to one of the civil district courts of Dallas County, Texas, in accordance with Rule 89, T.R.C.P.

McKAY, J., not participating.