

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00012-CV

HANNON, INC.  APPELLANT

V.

RONNY SCOTT, D/B/A DOLLAR
LAND  APPELLEE

------------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Hannon, Inc. appeals from an adverse judgment in favor of Appellee Ronny Scott, d/b/a Dollar Land. In ten issues, Hannon challenges the trial court's findings and conclusions regarding Hannon's breach of contract claim

---
[1]*See* Tex. R. App. P. 47.4.

and Ronny's fraud counterclaim. We will suggest a remittitur of damages, but in all other respects, we will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Hannon is a Texas corporation. Between May 2003 and July 2004, it operated a dollar store retail business located in Haltom City named Dollar Land through Aziz Hannon. According to Aziz, sometime in March or April 2004, Hannon decided to sell Dollar Land because one of Aziz's brothers had agreed to donate a kidney to another one of Aziz's brothers and Aziz could not manage Dollar Land in addition to two other businesses that he, his brother, or both had just opened together. Ronny and his wife, Elizabeth, expressed interest in purchasing Dollar Land, and Elizabeth visited the store three to five times, discussing with Aziz the store's revenue, the situation surrounding Aziz's brother's need for a kidney transplant, and the low volume of inventory at the store, which was due to the kidney issue, according to Aziz.[2] As a result of conversations with Aziz, the Scotts had the understanding that Dollar Land made sales totaling approximately $800 a day during the week and $1,000 a day on the weekend, that those figures would double if they invested another $20,000 towards the store's inventory, and that the store was "busy" and "bustling."

---

[2]Elizabeth had managerial experience at Save-A-Lot, Dollar General, and Family Dollar and would be responsible for running the day-to-day operations of the store.

On or about May 26, 2004, Ronny agreed to purchase Dollar Land for $80,000. The purchase agreement and earnest money receipt executed by Ronny and Aziz on May 26, 2004, recited that the $80,000 purchase price consisted of a down payment in the amount of $40,000, including a $2,500 earnest money deposit, which the Scotts paid on May 26, 2004, and the remaining balance of $40,000 paid over ten months at six percent interest. According to Aziz, the $80,000 purchase price accounted for $30,000 to $35,000 worth of inventory and $53,000 worth of fixtures. The Scotts were led to believe that the purchase price included everything on the store's front floor but excluded any items in the back warehouse, which was used by one of Aziz's brothers to operate a separate business. The Scotts asked to review Dollar Land's financial records before agreeing to purchase the store, but they were unable to review the records because Aziz said that he could not find them.

When the Scotts were unsuccessful in obtaining a business loan for any part of the purchase price of the store, they listed their house for $47,000 but sold it for approximately $37,000. At some point during the loan application process, Aziz prepared a document dated June 17, 2004, for the Scotts, which was addressed "To Whom it may concern" and stated in part, "With the store in the condition it is in[,] I am making around $800 a day during weekday and $1000 on weekends sometimes more sometimes a little less."

On June 30, 2004, Ronny and Aziz signed (a) a bill and contract of sale, which recited that Hannon sold to Ronny Hannon's "right and title to that name

3

[Dollar Land], the goodwill, management, revenues, and trade fixtures from that business and the inventory and equipment";[3] (b) a promissory note stating that Ronny agreed to pay Aziz $4,109.30 per month over ten months and acknowledging that Ronny had paid Hannon a $40,000 down payment;[4] and (c) a security agreement, pursuant to which Ronny granted Hannon a security interest "in the assets of [Dollar Land]." When Ronny signed the documents, he did not think that he was entering into a binding agreement; due to several patent errors in the language of the documents,[5] he thought that he was merely agreeing to "guidelines" or provisions that were going to be used in "something a little more professional."[6] However, Ronny soon realized that he had entered into a binding agreement, so he and Aziz made several agreed changes to the documents, and Ronny signed a check for the proceeds from the sale of his house over to Aziz to cover the amount of the down payment.[7]

---

[3]Dollar Land operated in a leased space.

[4]According to Elizabeth, Aziz had offered that Hannon would finance the remaining $40,000 if the Scotts could make a down payment of $40,000.

[5]For example, one paragraph in the promissory note erroneously identified Dollar Land as "Taste of Pakistan," and one paragraph in the security agreement erroneously identified Dollar Land as "USA Grosery."

[6]The Scotts had no intention of purchasing the business before examining the business records, according to Elizabeth.

[7]The Scotts were not represented by an attorney during the course of the purchase.

4

Elizabeth began operating Dollar Land on July 2, 2004. She and her two daughters performed an inventory and calculated a total of only 29,182 items in the store—at $1 per item, this amounted to less than the figure that Aziz had represented to the Scotts and that Elizabeth thought was present in the store at the time of the sale.[8] The Scotts also learned that several items that had been located on the floor of the front of the store had been removed before the Scotts took over because Aziz had agreements to lease the items.[9] The Scotts added inventory to the store, but the daily sales averaged less than the figures that Aziz had represented to the Scotts before the sale—between only $250 to $300 a day.[10] Elizabeth recounted that on any given day, if ten people entered the store, "that would be a lot of people in the store."

The Scotts made one payment of $2,400 on the promissory note in September 2004. Aziz received a check from the Scotts for $2,400 dated October 11, 2004, but it was returned for insufficient funds the first time he presented it for payment and returned "Closed" the second time he presented it

---

[8]Of the 29,182 items, 10,480 were balloons.

[9]The items included two Coke machines, an ice cream machine, a chip rack, a Coke rack, cigarettes, a "bill pay machine," "the money order machine," and two helium tanks.

[10]Ronny testified that he and Elizabeth had reason to doubt the sincerity of Aziz's explanation for selling Dollar Land; one of the brothers of Aziz who allegedly had the kidney operation showed the Scotts his scar, but the scar "looked old" and "looked healed" even though it had been only between three weeks to one month after he had the operation. Ronny did admit, however, that he was not a medical expert of any kind.

for payment. Aziz received no other payments from the Scotts toward the promissory note.

The Scotts closed Dollar Land at the end of November 2004 without first notifying Aziz. They sold the remaining inventory for $4,000 but left the collateral or fixtures in the leased space.[11] After closing the store, Elizabeth stopped by Aziz's convenience store in Mansfield to notify him that Dollar Land's revenue under their ownership did not match the figures that Aziz represented the store had made before the sale and that the collateral remained at the store. Thereafter, the Scotts periodically drove by the space that Dollar Land had occupied and noticed that the fixtures remained in the store until July 2005. At that point, their former landlord told them that he had to clear out the space because it had been rented to someone else. The Scotts incurred a $1,999 overall loss and owed over $3,000 in utility bills.

Hannon sued Ronny in March 2005 for breach of contract. Ronny answered and pleaded the affirmative defense of fraud, and he filed a counterpetition, alleging a fraud counterclaim based on the same facts. Trial was to the bench. The trial court signed an amended final judgment on October 19, 2009, in which it ordered (1) that Hannon take nothing on its breach of contract claim, (2) that Ronny recover $60,000 against Hannon on the fraud counterclaim, and (3) that Ronny recover prejudgment interest in the amount of $7,250 and

_____

[11]When referring to the items that were left at the store, Elizabeth used the terms "collateral" and "fixtures" interchangeably at trial.

6

postjudgment interest. The trial court had previously signed an order adopting and incorporating for all purposes the proposed findings of fact and conclusions of law submitted by Ronny. Those findings of fact included the following:

1. On or about June 30, 2004, Ronny Scott and Hannon, Inc entered into a transaction wherein Ronny Scott and his wife Elizabeth Scott purchased a business known as "[Dollar Land]" which was operated by Abdelaziz Hannon, hereinafter referred to as "Aziz."

2. During the discussions as to the purchase of this store, Aziz made multiple statements to Ronny Scott regarding the income of the store and the business contents that were included in the purchase of the business.

    a. Aziz represented that in purchasing the business, Mr. Scott and his wife Elizabeth were purchasing everything in the store from the store room forward.

    b. These items include, but are not limited to: cigarette inventory, helium tanks, [W]estern [U]nion, money order machines, an ice cream freezer, two large double door [C]oke coolers, and a large [C]oke display.

    c. Aziz removed certain of the products/inventory listed in [paragraph] b.[] from the business without compensating the Scott[]s.

    d. Other certain items listed in para b.[] were repossessed by the vendors.

3. Aziz made statements as to the emergent medical circumstances that forced the emergent sale of the business.

4. Aziz held out that the store was currently making $800.00 a day on the weekdays and $1,000.00 a day on the weekends, and with $20,000.00 in additional inventory the business would be making $45,000.00 per month. The Scott[]s [were] told that they were purchasing inventory worth approximately $30,000.00. In May, the Scott[]s signed an agreement to purchase the business.

7

5.  Aziz signed a letter in regard to the numbers referenced in [paragraph] 4, above to assist Ronny Scott in acquiring capital and/or financing for the business purchase.

6.  The Scott[s]' reliance on the statements of Aziz as to the contents of the business purchase and the business financials, sold their home [at] a [$]7,000.00 loss in order to put down the $42,500.00.

7.  On June 30, 2004, the parties executed the bill of sale, the promissory note with vendor's lien for $37,500.00 and the security agreement for the displays and fixtures in the store. The fixture list provided through discovery . . . indicates that the value of the fixtures and displays is approximately $54,000.00.

8.  On July 2, 2004, the Scott[]s took possession of [Dollar Land] and operated the business through November 2004.

9.  During the first week in operation, Beth Scott and her daughters took an inventory of the store. The count was less than 30,000 items making the product valued at approximately $1.03 per item.

10. The daily sales ledger failed to ever reflect the expected daily sales as represented by [Aziz].

11. For the five months the Scott[]s operated [Dollar Land], the company operated at a loss.

12. Ronny Scott would give money to the store from his paycheck at Gunderson to assist in the payment of the business expenses. The Scott[]s paid a significant portion of the $15,000.00 rent from Mr. Scott's paycheck. Additionally, Beth Scott still owes over $3,000.00 to utility companies for bills that the store was unable to pay.

    . . . .

14. Upon closing the doors, the Scott[]s sold the inventory to an individual for approximately $4,000.00.

8

15. The Scott[]s notified [Aziz] that the fixtures and displays were available for him to repossess at the store. [Aziz] chose not to mitigate the damages and abandoned the property.

The conclusions of law included the following:

1. Aziz, representing Hannon, Inc., perpetrated fraud upon the Scott[]s. Fraud occurs as follows:

. . . .

   a. A party makes a material misrepresentation.

      1. During the discussions as to the purchase of this store, Aziz intentionally made multiple statements to Ronny Scott regarding the income of the store. Aziz stated that the entire contents of the store excluding the warehouse were included in the purchase of the business and regarding the emergent circumstance as to force the sale. All of the assertions made by Aziz Hannon to the Scott[]s were false. These facts are material in that the statements affect whether a person would decide to purchase a business.

   b. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion.

      . . . .

      2. [Aziz], as operator of the business, knew that some of the items were not going to be included in the purchase and he knew that he was making a false statement when he told the Scott[]s that they were purchasing everything from the warehouse forward. These items include: cigarette inventory, helium tanks, [W]estern [U]nion, money order machines, an ice cream freezer, two large double door [C]oke coolers, and a large [C]oke display.

9

3. [Aziz] in his letter to finance companies as to the income of the business made a positive assertion. He either made such assertion recklessly without any knowledge of the truth or knew his statements were false. This is evident by his conflicting testimony as to the income of the store.

4. [Aziz] expressly told the Scott[]s that the inventory . . . was [worth] $30,000.00. This positive assertion assures that the business would operate at a loss. [Aziz] again either made the valuation of the inventory recklessly without knowledge of the truth or knew that his value was actually false.

In conclusion, [Aziz] made several positive assertions as to the contents and the financials, which he knew to be false[,] and/or he made multiple positive assertions recklessly without any knowledge of the truth.

c. The misrepresentation is made with the intention that it should be acted on by the other party.

1. Aziz made all the misrepresentations with the intent to induce the Scott[]s into purchasing [Dollar Land]. Everything that Aziz said in regards to the emergent situation, his brothers' supposed surgery, the other offers he was receiving, and the stated business contents and financials were all intended to induce the Scott[]s into action and to get them to purchase [Dollar Land].

2. If Aziz had told the Scott[]s that the business took a loss the year before and that the business was not actually making enough money to pay the bills, then [the] Scott[]s would likely have walked away; instead [Aziz] had to tell the Scott[]s falsities to convince them to purchase the business for $80,000.00[.]

10

d.  The other party relies on the misrepresentation and thereby suffers injury.

1.  The Scott[]s relied on the statements by Aziz and purchased [Dollar Land.] [T]he injuries suffered are as follows:

a.  The [$]42,500.00 paid to Hann[o]n, Inc.

b.  [$]3,000.00 in outstanding bills owed to utility companies by the Scott[]s[.]

c.  approximately $1,500.00 a month (x5 months) paid to [Dollar Land] from the paychecks of Ronny Scott[] to keep the business operating.

d.  Loss of [$]7,000.00 for the quick sale of the Scott[s]' home.

## III. FRAUD COUNTERCLAIM

In its fourth, fifth, sixth, seventh, and eighth issues, Hannon challenges the trial court's findings of fact and conclusions of law as they relate to Ronny's fraud counterclaim.[12]

### A.  Standards of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven*

---

[12]Hannon states in its fourth through eighth issues that "[t]he trial court erred in *finding*" something relevant to Ronny's fraud counterclaim. [Emphasis added.] Although the issue statements seem to expressly challenge only a finding of fact, some of the arguments additionally challenge or only challenge the trial court's conclusions of law as they pertain to the contested relevant fact finding. Therefore, we construe Hannon's fourth through eighth issues as challenging both the trial court's findings of fact and conclusions of law.

11

*Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for

12

differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

We review the trial court's conclusions of law as a legal question. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 519 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *Dominey v. Unknown Heirs & Legal Reps. of Lokomski*, 172 S.W.3d 67, 71 (Tex. App.—Fort Worth 2005, no pet.).

## B.    Fraud Standards

A party commits fraud by (1) making a false, material representation (2) that the party either knows to be false or asserts recklessly without knowledge of its truth (3) with the intent that the misrepresentation be acted upon, (4) and the person to whom the misrepresentation is made acts in reliance upon it and

13

(5) is injured as a result.[13] *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 527 (Tex. App.—Fort Worth 2009, pet. denied).

A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question. *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied). Materiality thus centers on whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied).

Proof that a defendant made a statement knowing of its falsity or without knowledge of its truth may be proved by either direct or circumstantial evidence. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998). Intent may be inferred from a party's actions before and after the fraudulent conduct and may also be established by either direct or circumstantial evidence. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986). A defendant who acts with knowledge that a result will follow is considered to intend the result. *Ernst & Young, L.L.P.*, 51 S.W.3d at 579.

---

[13]In addition to the elements of fraud, a fraudulent inducement claim requires proof that the complainant entered into a binding agreement as a result of the misrepresentation. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). To the extent that Ronny's counterclaim can be characterized as a claim for fraudulent inducement, Hannon does not argue that the parties failed to enter into a binding agreement.

14

The plaintiff must show actual and justifiable reliance on the misrepresentation. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). To determine justifiability, courts inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* (quoting *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). In other words, a person may not justifiably rely on a representation if there are "red flags" indicating such reliance is unwarranted. *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)); *see Gen. Motors Corp., Pontiac Motor Div. v. Courtesy Pontiac, Inc.*, 538 S.W.2d 3, 6 (Tex. Civ. App.—Tyler 1976, no writ) (citing Prosser on Torts for the contention that a person of ordinary intelligence may not "put faith in representations which any such normal person would recognize at once as preposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth").

## C.     False, Material Representations and Knowledge

In its fourth and fifth issues, Hannon challenges the trial court findings and conclusions that Hannon, through Aziz, made false, material representations to the Scotts and that Aziz made those false representations either with knowledge of their falsity or recklessly.

15

Elizabeth testified that Aziz told her that everything located in the front of the store was included in the sale of the business. However, Aziz removed several items from the front of the store upon its sale because the items were leased—something the Scotts did not discover until after they had already begun operating the store. Elizabeth testified that when she was considering whether to purchase Dollar Land, it would have been important to her to know that the items that Aziz had removed from the front of the store were not included in the sale.

Also, both Ronny and Elizabeth testified that Aziz led them to believe that Dollar Land made approximately $800 a day during the week and $1,000 a day on the weekend. Aziz drafted a document affirming these representations about the store's sales figures. But the store "didn't even come close" to achieving sales consistent with Aziz's representation, according to Ronny's and Elizabeth's testimony and their daily sales ledger. One of Ronny's exhibits is a document dated June 17, 2004—before Ronny signed the bill and contract of sale and the promissory note—showing that the Scotts used Aziz's figures in calculating their anticipated expenses associated with operating Dollar Land. Another exhibit is Hannon's 2004 income tax return, in which Hannon claimed a negative amount of ordinary business income.

The record demonstrates that at the time of the sale, Aziz had been operating Dollar Land since April or May 2003 and that he had experience operating other businesses. Aziz confirmed that he was the person responsible for handling Dollar Land's day-to-day business activities.

16

Contrary to Ronny's and Elizabeth's testimony, Aziz testified that the Scotts knew from "day one" that the items removed from the store were not part of the sale, and he challenged the authenticity of the June 17, 2004 document. However, as factfinder, the trial court could have chosen to disbelieve Aziz's testimony and also consider the June 17, 2004 document authentic and credible.

We hold that the evidence is legally and factually sufficient to support the trial court's findings regarding the removal of items from the front of the store and Aziz's representations about the store's daily revenue. *See City of Keller*, 168 S.W.3d at 807, 827; *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334; *Pool*, 715 S.W.2d at 635; *Garza*, 395 S.W.2d at 823; *see also Miller*, 142 S.W.3d at 345–46; *Burleson State Bank*, 27 S.W.3d at 613–14. Further, the trial court did not err by concluding that Aziz made false, material representations to the Scotts with knowledge of their falsity or recklessly without knowledge of their truth.[14] Accordingly, we overrule Hannon's fourth and fifth issues.

### D. Intent to Induce Action

In its sixth issue, Hannon challenges the trial court's findings and conclusions that Hannon made false representations with the intent to induce Ronny to act upon the misrepresentations. We have already upheld the findings of false, material representations. Regarding Hannon's intent, the direct and circumstantial evidence shows that Aziz sought to sell Dollar Land; that the

---

[14]Hannon challenges other findings and conclusions, but we need not address them. *See* Tex. R. App. P. 47.1.

17

Scotts were looking for a business to purchase; that Ronny was able to begin operating Dollar Land immediately upon purchasing it because the store contained inventory for immediate sale; that Ronny was able to figure the costs associated with operating Dollar Land—and, therefore, determine that he could afford to purchase the store—using the numbers that Aziz had misrepresented to the Scotts; and that Aziz never turned over any of Dollar Land's financial documents. We hold that the trial court's conclusion that Aziz possessed the intent to induce Ronny to act upon those misrepresentations is not erroneous. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 579; *Spoljaric*, 708 S.W.2d at 434–35. Accordingly, we overrule Hannon's sixth issue.

### E.    Reliance

In its seventh issue, Hannon challenges the trial court's conclusions related to Ronny's reliance on Aziz's false, material representations. Hannon does not assert any substantive argument challenging Ronny's actual reliance on Aziz's misrepresentations. Instead, Hannon argues that Ronny did not *justifiably* rely on Aziz's alleged misrepresentations because "even if the evidence supported the fact findings that false statements were made, the evidence is conclusive that [Ronny] did not take action for his own protection, seek advice of professionals[,] or otherwise confirm that information was accurate and therefore reliance was not reasonable or justified in this case." But Ronny did not have to conduct an independent investigation or audit of Dollar Land to justifiably rely on Aziz's false, material representations. This is because, in light of the record,

18

Aziz's misrepresentations about the items located in the front of the store and Dollar Land's daily revenue were not outlandish, preposterous, or so patently and obviously false that Ronny had to have closed his eyes to avoid discovering their falseness, nor were there any attendant "red flags" indicating that Ronny's actual reliance was unjustified. *See Grant Thornton LLP*, 314 S.W.3d at 923; *Gen. Motors Corp., Pontiac Motor Div.*, 538 S.W.2d at 6. Given Ronny's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of Aziz's misrepresentations, the trial court did not err by concluding that it was not extremely unlikely that there was actual reliance by Ronny on Aziz's misrepresentations. *See Grant Thornton LLP*, 314 S.W.3d at 923. Accordingly, we overrule Hannon's seventh issue.

## F. Caused Injuries

In Hannon's eighth issue, it challenges the trial court's conclusion that Ronny suffered injury as a result of Aziz's false representations. Hannon argues that Ronny's damages were caused by his failure to replenish inventory and to budget or expend money on advertising, utilities, or sales taxes. But Elizabeth testified that she and Ronny attributed the discrepancy between the sales figures during their ownership of Dollar Land ($250 to $300 a day) and the sales figures that Aziz had communicated to them before the sale (approximately $800 a day) to the removal of the leased items from the store. Elizabeth also testified that they added inventory to the store but that the post-sale revenue never matched the figures misrepresented to them by Aziz. In light of the foregoing, we hold that

19

the trial court did not err by concluding that Ronny suffered injury as a result of Aziz's misrepresentations. We overrule Hannon's eighth issue.

## IV. DAMAGES

In its ninth issue, Hannon challenges the award of damages to Ronny, arguing that Ronny "received more than what he actually paid to Hannon" under either the out-of-pocket measure of damages or the benefit-of-the-bargain measure of damages; that rescission was not a remedy available to Ronny because he did not plead for rescission of the bill and contract of sale and the promissory note; and that Ronny was not entitled to recover damages for the unpaid utility bills, the paychecks that were used to pay Dollar Land's bills, and the loss on the sale of Ronny's house. In its tenth issue, Hannon argues that Ronny failed to mitigate his damages.

"[I]t is well settled that one who is induced by fraud to enter into a contract has his choice of remedies. 'He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid.'" *Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 10, 307 S.W.2d 233, 238–39 (Tex. 1957). We agree with Hannon's observation that "rescission was the remedy sought to be crafted by the court in this case."

Rescission is an equitable remedy that extinguishes legally valid contracts that must be set aside because of, among other things, fraud. *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.—Fort Worth 2008, pet. dism'd). Upon rescission, the rights and liabilities of the parties are

20

extinguished; any consideration paid is returned, together with such further special damage or expense as may have been reasonably incurred by the party wronged; and the parties are restored to their respective positions as if no contract had ever existed. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex. 1987); *Smith v. Nat'l Resort Cmtys. Inc.*, 585 S.W.2d 655, 660 (Tex. 1979); *Holt v. Robertson*, No. 07-06-00220-CV, 2008 WL 2130420, at *6 (Tex. App.—Amarillo May 21, 2008, pet. denied) (mem. op.).

Hannon concedes that Ronny paid it $42,400—a $40,000 down payment and one monthly payment of $2,400. Elizabeth testified that she and her daughters performed an inventory of the store soon after the purchase and that they calculated a total of 29,182 items in the store, each valued at $1, all of which were sold at some point. Because Ronny was unable to return any of the inventory to Hannon, the trial court should have awarded Ronny the difference between the $42,400 in payments and the $29,182 in inventory that he received as consideration from Hannon, which is $13,218.

Hannon argues that Ronny received at least $53,000 worth of trade fixtures as part of the sale and that the trial court should have taken this amount into consideration when determining damages. But there is evidence that instead of retaining or selling the fixtures, Ronny and Elizabeth left the fixtures on the premises that Dollar Land had leased and notified Aziz that they were available for him to retrieve pursuant to the security agreement, which Ronny and

21

Elizabeth construed to identify the fixtures as collateral for the promissory note that Ronny had signed. Elizabeth testified that she was attempting to turn the collateral back over to Aziz to "mitigate the circumstances." The trial court could have reasonably concluded that Ronny returned part of the products that he had on hand at the close of Dollar Land and, therefore, returned "benefits" that he had received as part of the transaction. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 208–11 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

The awards for the outstanding utility bills and the money that Ronny used from his paychecks are damages or expenses reasonably incurred by Ronny resulting from Hannon's fraud. *See Smith*, 585 S.W.2d at 660. However, we cannot say the same about the award for the "quick sale" of Ronny's house; the means by which Ronny came up with money that he used for the down payment did not result from Hannon's fraud.

Hannon argues that rescission was not available to Ronny because he did not plead for rescission. While a trial court may not grant relief to a party in the absence of pleadings to support that relief, Texas courts have traditionally construed pleadings liberally, and in the case of rescission, at least one court has held that "factual allegations in the petition, coupled with a prayer for general relief, are sufficient to support a decree granting rescission." *Green Tree Acceptance, Inc. v. Pierce*, 768 S.W.2d 416, 421 (Tex. App.—Tyler 1989, no writ); *see* Tex. R. Civ. P. 301. Moreover, when the claims and defenses are

22

those which contemplate a particular remedy, a party may be entitled to that remedy despite a failure to specifically plead for such relief. *See Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991).

Ronny did not specifically request rescission as an equitable remedy to Hannon's fraud, but he did assert a claim for damages based on fraud and assert in his first amended answer that he "is not liable to [Hannon] because of fraud." It is well settled that "[a]s a rule, a party is not bound by a contract procured by fraud" and that rescission is a proper remedy for a contract procured by fraud. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998); *Tex. Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 773 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Consequently, because Ronny's fraud claim contemplated the remedy of rescission, *see Perez*, 809 S.W.2d at 218, we cannot conclude that the trial court erred by awarding Ronny rescission of the bill and contract of sale and the promissory note. *See Omega Energy Corp. v. Gulf States Petroleum Corp.*, No. 13-03-00275, 2005 WL 977573, at *3 (Tex. App.—Corpus Christi Apr. 28, 2005, pet. denied) (mem. op.) (reasoning similarly). Accordingly, we sustain part of Hannon's ninth issue and overrule its tenth issue.

If we determine that part of a damages award lacks sufficient evidentiary support, our proper course is to suggest a remittitur of that part of the damages. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). The party prevailing in the trial court should be given the option of accepting the remittitur

23

or having the cause remanded. *Id.* Based on our analysis above, we suggest a remittitur in the amount of $36,282.[15] *See* Tex. R. App. P. 46.3.

## V. BREACH OF CONTRACT

In its first, second, and third issues, Hannon argues that the trial court erred by rendering judgment that it take nothing on its breach of contract claim and by not awarding it attorneys' fees. Hannon concedes that *"[a]bsent legally sufficient proof of a valid defense to enforcement of the contract* against [Ronny] . . . Hannon met its burden of proof and conclusively established all of the elements of its claims against [Ronny]."* [Emphasis added.] The trial court found in favor of Ronny on his fraud counterclaim, and "rescission was the remedy sought to be crafted by the court in this case." Rescission extinguishes legally valid contracts. *City of The Colony*, 272 S.W.3d at 732. Accordingly, we overrule Hannon's first, second, and third issues.

## VI. CONCLUSION

In accordance with rule of appellate procedure 46.3, we suggest a remittitur of $36,282. *See Mahon v. Caldwell, Haddad, Skaggs, Inc.*, 783 S.W.2d 769, 772 (Tex. Civ. App.—Fort Worth 1990, no writ). If Ronny files in this court within fifteen days of the date of this memorandum opinion, a remittitur of $36,282, then our subsequent judgment will modify the trial court's judgment in

---

[15]This figure represents $60,000 (original award) less $23,718 (representing a difference of $13,218 between payments and inventory; $3,000 for utility bills; and $7,500 for Ronny's paychecks).

24

accordance with the remittitur and, as modified, affirm that judgment.[16] *See id.* If the suggested remittitur is not filed, we shall reverse the trial court's judgment and remand this cause to the trial court for a new trial. In all other respects, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED: May 12, 2011

---

[16]The amended final judgment awarded Ronny prejudgment interest on the damages awarded ($60,000) from February 21, 2007, at the rate of 5% per annum. If Ronny files a remittitur of $36,282, in addition to the damages awarded to Ronny on his counterclaim, the judgment will be modified to reflect a recalculated award of prejudgment interest on damages in the amount of $23,718 from February 21, 2007, at the rate of 5% per annum. *See Mahon*, 783 S.W.2d at 772 (suggesting proportional reduction in prejudgment interest as part of suggested remittitur).