Warren H. SMITH et ux., Petitioners,

v.

NATIONAL RESORT COMMUNITIES,
INC., Respondent.

No. B–8168.

Supreme Court of Texas.

June 27, 1979.

Rehearing Denied Sept. 19, 1979.

Hooper, Robinson & Moeller, Malcolm Robinson, Austin, for petitioners.

Clark, Thomas, Winters & Shapiro, Barry Bishop and Mary Joe Carroll, Austin, for respondent.

STEAKLEY, Justice.

This is a suit by Warren H. Smith and wife for rescission of a contract to buy a lakefront lot, and for restitution, with the damages alleged to be in the amount of the purchase price, $25,700, plus "a reasonable amount of interest on said amount from July 2, 1973, plus expenditures for taxes from such time." After trial to the court a take-nothing judgment was rendered. The trial court concluded that the Smiths had failed to prove the elements required to support the remedy of rescission. This judgment was affirmed by the Court of Civil Appeals. *Smith v. National Resort Communities, Inc.*, 574 S.W.2d 639. We will reverse these judgments and render judgment for the Smiths.

Warren H. Smith and wife, plaintiffs below and Petitioners here, are residents of Dallas County, Texas. National Resort Communities, Inc., herein called NRC, the defendant below and Respondent here, was the developer of Highland Lake Estates on Lake Travis, located northwest of Austin, Texas. In 1973, the Smiths were flown to view the residential lots in the subdivision. Under date of May 12, 1973, they executed with NRC a Contract for Deed in which they agreed to buy Lot No. 23052, Section 23, Highland Lake Estates, for a cash price of $25,700. The lot was later conveyed to the Smiths by warranty deed under date of August 9, 1973.

This suit for rescission by the Smiths is grounded on allegations that the lot was not usable for residential purposes because it was wholly below the 715 foot contour line and as such was subject to inundation under an easement held by the Lower Colorado River Authority, a fact unknown to the Smiths and not disclosed to them by NRC.

In response to Requests for Admissions served by the Smiths pursuant to Rule 169, Texas Rules of Civil Procedure, NRC admitted:

1. On your standard contract for deed executed between yourself and the Plaintiffs there are no written statements concerning a 715 foot easement granted to the Lower Colorado River Authority.

3. There are no contour lines showing elevations reflected on the Plat of Highland Lake Estates, Section 23, recorded in Volume 58 at Page 22 of the Plat Records of Travis County, Texas.

7. Lot 23052, Highland Lake Estates, Section 23, is entirely below the 715 foot contour line and is within the overflow easement granted to the Lower Colorado River Authority.

8. The Defendant, NRC, Inc., on May 12, 1973, had knowledge that Lot 23052, Highland Lake Estates, Section 23, was below the 715 foot contour line and subject to the overflow easement granted to the Lower Colorado River Authority.

9. In neither the contract for deed between National Resort Communities, Inc., and the Plaintiffs nor in the warranty deed from the Defendant to the Plaintiffs recorded in the Deed Records of Travis County, Texas, is there a reference that Lot 23052, Highland Lake Estates, Section 22, [sic] is below the 715 foot contour line.[1]

---

1. We agree with the holding of the Court of Civil Appeals that the furnishing of a title policy after consummation of the transaction was after the fact, and did not serve the purposes of disclosure.

10. If the Lower Colorado River Authority exercised its rights under the overflow easement and maintained the water level at 715 foot contour mark then Lot 23052 of Highland Lake Estates, Section 23, would be completely underwater.

■ A sales brochure received by the Smiths on the promotional trip is in evidence. Its major emphasis is upon the attractiveness of the lots in Highland Lake Estates as a homesite in a resort and recreational area.[2] It is undisputed that the Smiths were not personally informed by any representative of NRC of the LCRA overflow easement or that the lot they were purchasing was below the 715 foot contour line. There was no reference to or suggestion of the existence of the easement in the promotional literature. The general counsel of NRC testified that the deed records referred to on the plat of Highland Lake Estates, Section 23, did not disclose the elevation of the lots with reference to the 715 foot contour line. It also appears to be undisputed that there was no type of marker showing the elevation of the lot purchased by the Smiths, and it was conceded by NRC in its Reply Brief that the exact elevation of the lot could be determined only through a survey. Further, we find no evidentiary support in the record for the finding of the trial court that "there was visible evidence that Lake Travis had risen above the level of Lot 23052 and adjoining lots in the past, and this visible evidence existed on the date of plaintiffs' purchase of Lot 23052." NRC says in its Reply Brief that this conclusion of the trial court "was apparently reached from the photographs introduced into evidence, which show the condition of the lot." Our conclusion after inspecting these photographs is that they do not constitute evidence that it was visible that Lake Travis had risen above the level of the lot purchased by the Smiths.[3]

■ The problem here does not concern defects affecting marketable title to property of which a buyer may be charged with notice. We are concerned with conditions affecting the suitability of the property for use in building a home, the purpose for which NRC promoted its sale and for which the property was purchased by the Smiths.

2. Two years ago Lago Vista was acquired by National Resort Communities, Inc., a subsidiary formed by the huge National Homes Corporation to capture a share of the booming American market for homesites in resort and recreation areas. . . .

Implementing the venture is Ray Thomas, marketing vice president. . . .

. . . Everything that has proved so popular . . . at Lago Vista is now being complemented with similar undertakings at Highland Lake Estates next door. . . .

'Customers are more *affluent*, too,' Thomas has pointed out. . . . That means that lots of people who have always wanted a lakeside retreat can now own one.

But do they really want a lakeside retreat? One more study, this one by the University of Michigan, indicates they do. Its researchers polled people to see what they earmarked their savings for. A majority replied, 'A second home.' Not a *larger* home, but an auxiliary one.

Who buys lots, builds second homes at Highland Lake Estates and Lago Vista?

'I think only 25 per cent of our customers, something like that, make their purchases simply for investment's sake,' Thomas says. The other 75 per cent sincerely intend to build a second home, or an ultimate home, on their property.

The landscape is changing dramatically. More than 75 houses, ranging from charming to luxurious, have sprouted on Lago Vista's golden shores, and new foundations are being poured. As Ray Thomas says, 'In the near future every site will have a home occupied by a lucky family. This, after all, is the end-product we are shooting for.'

Sales Brochure, Highland Lake Estates/Lago Vista.

3. Indeed, these photographs were introduced into evidence by Counsel for NRC with this statement:

"I will throw them in and add to your pile. These are the Defendants Exhibits 1–10. They are photographs of property and surrounding property, and I see little benefit to them, but as long as we've got them, we'll introduce them."

Although our courts have not directly addressed this problem, the parties appear to be in agreement that the applicable rule, with which we agree, is that a seller of real estate is under a duty of disclosing material facts which would not be discoverable by the exercise of ordinary care and diligence on the part of the purchaser, or which a reasonable investigation and inquiry would not uncover. See Keeton, *Rights of Disappointed Purchasers*, 32 Tex.L.Rev. 1 (1953). As to this, there is less strictness in recognizing a right of rescission and restitution in contrast to a deceit action in which damages are sought. W. PROSSER, LAW OF TORTS § 110 at 731–36 (4th ed. 1971). The RESTATEMENT (SECOND) OF TORTS § 551, comment (b) (1977) states that even in the absence of a duty of disclosure, a purchaser is entitled to rescind the transaction if an undisclosed fact is basic and one which the seller knows his purchaser would regard as material.

██ A corollary principle is that where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts. *Rowntree v. Rice*, 426 S.W.2d 890 (Tex.Civ.App.1968, writ ref'd n. r. e.). There is an analogy to the rule considered by us in considerable depth, and with approval, in *Champlin Oil & Refining Co. v. Chastain*, 403 S.W.2d 376 (Tex.1965), that an estoppel may arise as effectually from silence, where there is a duty to speak, as from words spoken. See generally, *Weintraub v. Krobatsch*, 64 N.J. 445, 317 A.2d 68 (1974); *Clauser v. Taylor*, 44 Cal. App.2d 453, 112 P.2d 661 (1941); *Cohen v. Vivian*, 141 Colo. 443, 349 P.2d 366, 80 A.L. R.2d 1448 (1960); *Sorrell v. Young*, 6 Wash. App. 220, 491 P.2d 1312 (1971); and the Annotation, Fraud Predicated on Vendor's Misrepresentation or Concealment of Danger or Possibility of Flooding or Other Unfavorable Water Conditions, II. Silence, § 3. Overflow or flooding of property generally, 90 A.L.R.3d 568, 583 (1979).

On the occasion of the execution of the contract of sale of the lot in question, the Smiths received an offset printed sheet entitled "STATEMENT OF RESERVA-TIONS, RESTRICTIONS, TAXES AND ASSESSMENTS," together with a twenty-eight page writing with the caption "Declaration of Reservations Highland Lake Estates County of Travis, Texas." NRC contends that these writings reasonably disclosed to the Smiths the material facts of the LCRA overflow easement and that the lot purchased by them was below the 715 foot contour line, or alerted them to investigate the possible existence of these facts. The Court of Civil Appeals held that the writings were some evidence in support of the finding of the trial court that "a person of ordinary intelligence, in the exercise of reasonable diligence, would be placed on notice that the flood easement might affect the lot in question." Upon detailed examination of these writings we disagree with the finding of the trial court and with the conclusions of the Court of Civil Appeals.

The STATEMENT is divided into three sections, only one of which is material here. It is introduced with the words "Reservations and Restrictions: " and reads as follows:

> RESERVATIONS AND RESTRICTIONS: The reservations and restrictions affecting the lots in this subdivision are those recorded in Book 3987 at Page 2140 of the Land Records of Travis County, Texas, a copy of which is attached to and is part of this Statement of Reservations, Restrictions, Taxes and Assessments. These reservations and restrictions are enforceable by other lot owners in the subdivision.

There is no reference to or suggestion of any easement held by LCRA or any other entity. Indeed, the last sentence, "These reservations and restrictions are enforceable by other lot owners in the subdivision." clearly indicates that the reservations or restrictions were for the benefit of other lot owners, and were designed for their mutual protection. The copy of the Reservations attached to the STATEMENT is also misleading as to the LCRA easement. On its first page the Declaration refers to plats of record pertaining to Sections 4, 5, 6, 8, 9, 10 and 14. The lot purchased by the Smiths is

in Section 23. The Declaration also states that it is "designed for the mutual benefit of the lots . . . and does hereby fix the protective conditions upon and subject to which all lots, parcels and portions . . . shall be held;" and further, "[that such restrictions] are and each thereof is imposed upon said Tract as a mutual equitable servitude in favor of each and every parcel of land therein as the dominant tenements, . . . ." There then follows the major heading COMMITTEE OF ARCHITECTURE, with various divisions in sequence, titled as follows:

IMPROVEMENT STANDARDS (with four sub-paragraphs);

LAND USE AREAS—GENERAL, with subheadings, Advertising, Air Conditioning Units, Moorings, Piers or Docks, Building Exterior, Clothes Lines, Dust and Erosion Control, Easements, Electrical Power, Nuisances, Occupancy of Structures, Plumbing, Storage of Materials, Storage of Tools and Trash, Temporary Buildings, Unnatural Drainage, Drilling and Mining, Use of Premises, Subdivision of Lots, LCRA Overflow Easement;

LAND USE AREAS—RESIDENTIAL, with subheadings, Livestock, Poultry and Pets, Sewage Disposal Systems, Side Distances, Garages and Carports, Spaces Between Buildings—Passage Ways to Dwelling Units, Location of Accessory Buildings—in the R Land Use Areas, Side Yard Setback—Reverse Corner Lots;

R–1 SINGLE FAMILY RESIDENTIAL DISTRICT, with subheadings, Uses Permitted, Maximum Building Height, Minimum Yard Requirements, Maximum Area of Dwelling, Minimum Dwelling Unit Size;

R–2 TWO FAMILY RESIDENTIAL DISTRICT, with subheadings, Uses Permitted, Maximum Building Height, Minimum Yard Requirements, Maximum Area of Dwelling, Minimum Dwelling Unit Size;

R–4 MULTIPLE RESIDENTIAL DISTRICT, with subheadings, Uses Permitted, Maximum Building Height, Minimum Yard Requirements, Maximum Area of Dwelling, Minimum Automobile Parking Requirements, Minimum Dwelling Unit Size;

R–6 APARTMENT, TOWNHOUSE & COTTAGE DISTRICT, with subheadings, Uses Permitted, Maximum Building Height, Minimum Yard Requirements, Maximum Area of Dwelling, Minimum Automobile Parking Requirements, Minimum Dwelling Unit Size;

C–2 GENERAL COMMERCIAL DISTRICT, with subheadings, Uses Permitted, Maximum Building Height, Storage of Materials, Maximum Area of Building; and

GENERAL PROVISIONS, with subheadings, Duration, Notices, Severability, Enforcement, and Maintenance Fee and Property Owner's Association.

Item 19, under the heading, "B. Land Uses Areas—General" at the bottom of page 8, reads as follows:

19. LCRA Overflow Easement.

The Lower Colorado River Authority holds an easement to innundate [sic] and overflow any portion of the subdivision lying below the contour line 715 feet above sea level. Any such areas shall be subject to such easement, and all structures and improvements therein shall be constructed so as to accommodate any such inundation or overflow in a fashion approved by the Architectural Committee.

■ There is no suggestion in this recitation that any lot other than those in Sections 4, 5, 6, 8, 9, 10 and 14 were below the 715 foot contour line. One would reasonably infer that a lot in another section, such as Section 23, would not lie below the 715 foot contour line and as such would not be subject to inundation under the LCRA overflow easement. Indeed, a careful reading by the Smiths of the entire Declaration of twenty-eight pages would yet not have reasonably alerted them to the possibility that the mentioned easement encumbered the lot they were purchasing.

■ Accordingly, we hold that the Smiths established their right to judgment rescinding their contract with NRC for the purchase of the lot in question. As previously noted, the trial court rendered a take-

nothing judgment against the Smiths in their suit for rescission and this rendered unnecessary a determination of the suit for damages in the nature of restitution. Rescission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract. *Groce v. P. B. Yates Mach. Co.*, 288 S.W. 161 (Tex.Comm'n App.1926, jdgmt adopted), citing *Hunt County Oil Co. v. Scott*, 28 Tex.Civ.App. 213, 67 S.W. 451, 452 (1902 writ ref'd); *Holland v. Western Bank & Trust Co.*, 56 Tex.Civ.App. 324, 118 S.W. 218, 119 S.W. 694 (1909); *Wintz v. Morrison*, 17 Tex. 372, 67 Am.Dec. 658 (1856); H. BLACK RESCISSION OF CONTRACTS AND CANCELLATION OF WRITTEN INSTRUMENTS § 695 (1916). See also *Atkins v. Beasley*, 544 S.W.2d 505 (Tex.Civ.App.1976, no writ) and cases there cited stating the principle that if damages as well as rescission are essential to accomplish full justice, they will both be allowed.

The special damage established at trial by the Smiths was the payment of taxes for two years in the sum of $49.90, and the payment of an annual maintenance fund bill from NRC in the sum of $48.00, a total sum of $97.90.

The Smiths also sought "a reasonable amount of interest" on the purchase price of $25,700 "from July 2, 1973." The reason for or the significance of the date of July 2, 1973, is nowhere shown. It was admitted by NRC that the Smiths "paid" and NRC "received the sum of $25,700 for Lot 23052 . . . ." It is indicated in the testimony of Warren H. Smith that this occurred on August 9, 1973, the date NRC conveyed Lot 23052 to the Smiths by warranty deed.

This Court in *Watkins v. Junker*, 90 Tex. 584, 40 S.W. 11 (1897) laid down the rules that where the measure of recovery is fixed by the conditions existing at the time that the injury is inflicted, the person entitled to recover has also the right to have compensation for the detention of the mon-

ey to which he is entitled by reason of the wrong done to him; that if interest be properly an element of damages in any case, then it is so as a matter of law; and that the courts have by analogy adopted the legal rate of interest fixed by statute as the standard by which to be governed in assessing damages for the detention of money. Accord, *Texas Company v. State*, 154 Tex. 494, 281 S.W.2d 83 (1955).

Accordingly, the judgments of the Court of Civil Appeals and of the trial court are reversed and judgment is rendered rescinding the contract of May 12, 1973 and August 9, 1973, between the Smiths and NRC, and awarding damages to the Smiths in the sum of $25,700, plus interest thereon at the legal rate of six per cent from August 9, 1973, plus the sum of $97.90.

GREENHILL, C. J., and CAMPBELL, J., concur in result.

Dissenting opinion by McGEE, J.

McGEE, Justice, dissenting.

I respectfully dissent, and would affirm the judgment of the court of civil appeals for the reasons stated in its opinion. 574 S.W.2d 639.