**Affirmed and Opinion filed March 24, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-14-00017-CV

## JAMES E. ARCHER, JR. AND GIDGET ARCHER, Appellants

### V.

## DDK HOLDINGS LLC, DIANE E. CAMPBELL, AND HAYES LEASING COMPANY, INC., INDIVIDUALLY AND D/B/A HAYES TRUCK GROUP, Appellees

**On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 2010-62731**

## O P I N I O N

This is an appeal from a nonjury trial of two sets of competing breach-of-contract claims between the parties to a commercial lease and the parties to a sublease of the same property. James and Gidget Archer challenge the legal sufficiency of the evidence to support the judgment against them. Finding no error, we affirm.

# I. BACKGROUND

When James Archer and his wife Diane Campbell divorced, Campbell was awarded a large commercial property. She leased the property back to James, who sublet a portion of it to Hayes Leasing Co., Inc.; thus, James is the tenant under the Master Lease, and Hayes is the subtenant under the Sublease.[1] James and his then-wife Gidget sued Campbell and Campbell's successor, primarily for claims allegedly arising from the Master Lease, and sued Hayes for claims allegedly arising from the Sublease. We discuss the two contracts separately.

## A.     The Master Lease

Under the terms of the Master Lease that Campbell and James executed in February 2004, James was required to pay Campbell base rent, and to pay "additional rent" equal to the ad valorem taxes on the property and its improvements. James was not required to pay this additional rent before December 31st of the tax year. The Master Lease also addressed the parties' maintenance-and-repair obligations, and provided that if Campbell wished to transfer the property, she had to give James thirty days' written notice so that he could make an offer to purchase it.

After providing advance notice to James, Campbell sold a large portion of the property to a third party in October 2006. Effective as of the date of the sale, James and Campbell amended the Master Lease to exclude the part of the property that had been sold. Both at the time of the sale and in 2007, Campbell demanded that James pay additional rent in the amount of the 2006 ad valorem taxes that had accrued prior to the sale, but James refused.

---

[1] Because James and Gidget have the same last name, we refer to them using their first names.

**B.     The Sublease**

James subleased a portion of the property to Hayes Leasing Co., Inc. in March 2004; in the sublease, James is the sublandlord and Hayes is the subtenant. The Sublease included James's warranty that the premises "are in compliance with all laws, ordinances, codes, rules and regulations" covering the premises. Like the Master Lease, the Sublease addressed the contracting parties' respective obligations to maintain and repair the property. Among other things, the Sublease provided that James was responsible for the costs of repairing latent defects and for the property's compliance with present and future laws relating to health and safety. The Sublease further provided that a party failing to perform its nonmonetary obligations within thirty days after written notice of the nonperformance would be in default. If James were in default, then Hayes could cure the default and demand reimbursement; if James failed to reimburse Hayes within ten days, then Hayes could deduct the unreimbursed expenses from the rent. The parties to the Sublease further agreed that an "Event of Default" under the Master Lease also would be an "Event of Default" under the Sublease.

In 2007, Hayes discovered that there were six or seven open building permits on the property, and that Hayes could not obtain a certificate of occupancy unless it first brought the property into compliance with city codes. Over a period of several years, Hayes spent over $18,000 to remedy these violations. James refused to reimburse Hayes for the work.

In November 2008, James notified Hayes that he had transferred the Sublease to his then-wife Gidget, but he continued to be Hayes's primary contact for communications about the property. Like James, Gidget refused to reimburse Hayes for the costs of remedying code violations.

At around the same time that James transferred the Sublease to Gidget, a

portion of the building's roof was damaged by storm winds, and Hayes decided to replace the entire roof. When contractors removed the existing roof, they discovered that the concrete underlay was crumbling and the metal supports had deteriorated. Because the roof repairs could not be completed until this damage was addressed, Hayes paid over $45,000 for these repairs to be performed on an emergency basis. After Hayes had emailed James at least three times and written to Gidget twice about reimbursement for the cost of repairing these items, Gidget's attorney responded asserting that the defects were discoverable in 2004 and requesting additional support for Hayes's conclusion that these were latent defects. Hayes then deducted the costs of repair from the rent. The parties resolved that dispute in March 2010, when Gidget signed a settlement agreement with Hayes, agreeing to share equally in the costs of these repairs. Because Hayes already had deducted the full amount of the repair costs from the rent, they agreed that Hayes would pay rent at a higher rate for sixteen months until Gidget had been repaid for her share of the repair costs.

In the meantime, additional repair issues had arisen. Less than two weeks before Gidget and Hayes settled their dispute about the roof repairs, Hayes wrote to Gidget regarding an awning that had begun slipping and holes in the parking lot. Hayes reported that one sinkhole in particular appeared to be related to an underground plumbing line. Once again, James was the one who responded, asserting that the awning "is not our expense"; he did not address the holes in the parking lot at that time. Before the end of March 2010, Hayes emailed James again, repeating earlier demands for a copy of James's agreement with Gidget about the assignment of the Sublease and seeking copies of all correspondence to or from Campbell regarding the property. This time, however, Hayes sent a courtesy copy of the email to Campbell's attorney, and Campbell began to demand

4

that James maintain and repair the property in accordance with the Master Lease.

## C. Campbell's Repair Demands and Termination of the Master Lease

On March 25, 2010, Campbell wrote to James, demanding that he "commence repairs of all defects of the Premises" within fifteen days. The only defects mentioned at that time were the sinkhole and the awning. James's attorney replied that Hayes was making arrangements to complete the repairs.

Campbell responded on April 20, 2010. She noted that a provision in the Master Lease required the tenant to be given thirty days' written notice before a failure to perform became an "Event of Default," and that James had been given notice on March 25, 2010 to repair the awning and the sinkhole. She stated that James had until April 26, 2010 to address those matters. Campbell also included a lengthy report by Professional Engineering Inspections, Inc. regarding other repairs and maintenance that the property required, and gave James thirty days to remedy those issues.

On April 26, 2010, James's attorney responded, "The alleged notice is rejected. Nearly all of the material items identified . . . were conditions that were in existence [when the parties executed the Master Lease] on February 25, 2004. [James] took the Premises as is and had no obligation to improve the condition." James took the position that he was required to perform only those repairs that were necessary to the continued use of the property, and he reasoned that because Hayes was still using the property, no repairs were necessary.

That same day, Campbell formed DDK Holdings, LLC and transferred the property and the Master Lease to it. James was notified of the transfer approximately ten days later, but he neither responded further to the repair demands nor commented on the transfer. On August 27, 2010, DDK terminated

5

the Master Lease, citing the failure to maintain and repair the property in accordance with the Master Lease.

## D.    The Lawsuit

Less than a month after the Master Lease's termination, Gidget sued Campbell and DDK, asserting that James had assigned his interest in the Master Lease to Gidget in 2008. While the suit was pending, Hayes continued to send demand letters to Gidget for reimbursement of the amounts that it had expended to address the code violations on the property. More than six months after the Master Lease was terminated, Gidget wrote to Hayes, demanding immediate payment of past-due rent. Hayes responded that rent had been timely paid through the date when the Master Lease was terminated, and pointed out that a termination of the Master Lease also constituted a termination of the Sublease. Hayes further stated that because the $18,292.23 that Hayes had paid to remedy code violations was larger than the balance that Hayes owed under the settlement agreement concerning the roof repairs, Hayes had deducted the former from the latter, and owed Gidget nothing.

At some point, James became a co-plaintiff with Gidget, and Hayes became a co-defendant with Campbell and DDK.[2] Ultimately, James and Gidget asserted claims against Campbell, DDK, and Hayes for civil conspiracy, tortious interference with contract, conversion, and breach of contract. In addition, they alleged that Campbell and DDK were alter egos of one another, and asserted claims solely against Campbell for violation of the Texas Uniform Fraudulent Transfer Act, and for declarations that both the purported transfer to DDK and the termination of the Master Lease were void. All of the defendants counterclaimed

---

[2] The amended petition or petitions by which those changes first were made are not in the record.

6

for breach of contract.

The case was tried without a jury, and the trial court granted directed verdicts against James and Gidget on their civil-conspiracy, tortious-interference, and conversion claims and their alter-ego allegations, and ruled against them on all of their remaining claims. Regarding the Master Lease, the trial court stated in its final judgment that (1) Campbell and DDK did not breach the Master Lease, (2) James did breach the Master Lease, and (3) the Master Lease was validly terminated. The trial court ordered James to pay Campbell $61,823.12, which was the amount that Campbell had demanded from James in 2007 for the 2006 ad valorem taxes that had accrued before a portion of the property was sold, together with 18% interest and $125,000 in attorney's fees, as authorized in the Master Lease. Regarding the Sublease, the trial court found that James and Gidget breached the Sublease, and Hayes did not breach it. The trial court awarded Hayes no damages, but held James and Gidget jointly and severally liable for Hayes's attorney's fees in the amount of $120,000, as authorized by the Sublease. In accordance with James and Gidget's request, the trial court issued findings of fact and conclusions of law, and none of the parties requested additional or amended findings. Finally, the trial court denied James and Gidget's motion to modify, correct, or reform the judgment.

## II. ISSUES PRESENTED

In four issues with numerous subsections, James and Gidget challenge the trial court's judgment or findings that (a) James breached the Master Lease; (b) Campbell did not breach the Master Lease; (c) James breached the Sublease, and Hayes did not breach it; and (d) Gidget is liable to Hayes for its attorney's fees.

7

# III. STANDARD OF REVIEW

Although James and Gidget frame their issues as challenges to the legal and factual sufficiency of the evidence, they do not address the evidence favorable to the defendants, arguing instead that there is "no evidence" to support the judgment or the trial court's findings; that the evidence favoring them is undisputed; and that they are entitled to rendition of judgment as a matter of law. Because the Archers have made legal-sufficiency arguments, but have made no factual-sufficiency arguments, they have waived any challenge to the factual sufficiency of the evidence. *See* TEX. R. APP. P. 38.1(i). We accordingly apply only the legal-sufficiency standard of review.

In an appeal from the judgment rendered after a non-jury trial, we review the trial court's findings using the same standards of review that apply to a jury's verdict. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). To analyze the legal sufficiency of the evidence supporting a finding, we review the record in the light most favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or

(d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. It is the factfinder's responsibility to weigh credibility and resolve conflicts in the evidence, and we will defer to those determinations so long as they are reasonable. *See id*. at 819–20.

## IV. THE PARTIES TO EACH CONTRACT

The parties to the Master Lease are identified in that contract as the landlord and tenant, and the parties to the Sublease are identified as the "sublandlord" and the "subtenant." There is no dispute before us about the identities of the parties at the ends of this chain: the landlord under the Master Lease was first Campbell, and then DDK; the subtenant under the Sublease was Hayes.

But one of the matters disputed at trial was the identity of the sublandlord. The trial court stated in its findings of fact that James assigned the Sublease to Gidget in November 2008, so that both James and Gidget breached the Sublease. The trial court therefore held James and Gidget jointly and severally liable for Hayes's attorney's fees, and James and Gidget specifically challenge that portion of the judgment. Although we normally address challenges to liability findings before addressing fee awards, the basis of their argument regarding attorney's fees is that Gidget was not the sublandlord. They contend that Gidget could not have breached the contract because it is undisputed that she was assigned only the right to receive the Sublease's benefits, but never assumed any of the Sublease's obligations. Thus, before we review the correctness of the trial court's challenged liability findings on the breach-of-contract claims, we first resolve the question about Gidget's relationship to the Sublease, so that when we address liability, it will be clear whose liability was properly at stake.

James and Gidget assert that Gidget had no lease or other contract with Hayes; that it is undisputed that James simply assigned to Gidget the benefits of

9

the Sublease; and that Gidget did not assume any of the Sublease's obligations. But these assertions are contradicted by the record, the pleadings, and even the relief they seek in this appeal. There *is* a contract between Gidget and Hayes, and Gidget not only expressly acknowledges in that contract that she is the sublandlord, but she has asked us to render judgment in her favor against Hayes for its alleged breach.

The contract to which we refer is the settlement agreement by which Gidget and Hayes settled a dispute about the sublandlord's responsibility for the costs of roof repairs. After Hayes expended over $45,000 to perform roof repairs that Hayes believed were the sublandlord's responsibility, Hayes and Gidget entered into a settlement agreement in which they agreed to split the repair costs. The settlement agreement provides that it "does not modify the Sublease in any manner except as specifically stated herein." Significantly, however, the settlement agreement does modify a key term that affects all of these provisions: the identity of the sublandlord. In the Sublease as originally executed on or about March 1, 2004, James is identified as the sublandlord. But in the settlement agreement, Hayes and Gidget agreed that Gidget "is Sublandlord to a Sublease dated March 1, 2004 wherein [Gidget] Subleased to Hayes" the property that is the subject of this suit. James and Gidget do not argue that this language of the settlement agreement is not enforceable; indeed, their brief contains no acknowledgement that it exists. They instead assert that it is undisputed that James assigned to Gidget only the Sublease's benefits, and that there is no evidence that Gidget accepted the Sublease's obligations. *See Jones v. Cooper Indus., Inc.*, 938 S.W.2d 118, 124 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (explaining that an "assignee of a contract is not bound to perform the assignor's obligations under the contract unless they are expressly or impliedly assumed by the assignee").

10

But contrary to their characterization of the record, there is evidence that James assigned the entirety of the Sublease to Gidget, and that Gidget accepted the sublandlord's obligations. Although James testified at trial that he assigned only the Sublease's benefits, he also admitted that he testified in his deposition that he assigned the entirety of the Sublease to Gidget. Moreover, when James first emailed Hayes in November 2008 about Gidget's role, he did not merely say that he had assigned the benefits of the Sublease to Gidget. He wrote that he had "transferred" the Sublease to Gidget; he thanked Hayes for its help over the years; and he wished Hayes the "best of luck in the future." This supports an inference that James was stepping out of his role as sublandlord, and turning that role over to Gidget. Although James later interacted with Hayes regarding its repair complaints, James agreed at trial that in doing so, he was working for Gidget. In addition, the Sublease required Hayes to name the sublandlord as an additional insured, and in March 2010, James asked Hayes for a copy of their insurance policy naming Gidget as an additional insured.

For Gidget's acceptance of the sublandlord's obligations, we need look no further than the settlement agreement. Gidget not only refers to herself in the agreement as the sublandlord and as the person who subleased the property to Hayes, but the agreement resolves a dispute between Gidget and Hayes about the costs of repairs to the property. If Gidget had merely been assigned the right to receive the Sublease's benefits, Gidget would have had no obligation to pay for any repairs, and the dispute about the costs of repairs would have been a matter for Hayes to resolve with James rather than with Gidget. Thus, from all of this evidence, the trial court reasonably could find that James assigned, and Gidget accepted, the Sublease's obligations as well as its benefits.

James and Gidget additionally contend that Gidget cannot be held liable for

11

Hayes's attorney's fees because in the divorce decree at the end of James and Gidget's marriage, Gidget was awarded "any monies owed *by*" Campbell, DDK, or Hayes.[3]  But the attorney's fees that the trial court in this case ordered Gidget to pay Hayes are not monies "owed *by*" Hayes; they are funds owed *to* Hayes.  Thus, by its terms, the cited provision of the divorce decree does not apply.[4]

In sum, we conclude that there is legally sufficient evidence that James assigned to Gidget the Sublease's obligations as well as its benefits.

## V.  CLAIMS REGARDING THE MASTER LEASE OF THE PROPERTY TO JAMES

In challenging the trial court's findings regarding breach of the Master Lease, most of James and Gidget's appellate arguments focus on the correct interpretation of the contracts in this case.  When interpreting a contract, we focus on identifying and giving effect to the parties' intent as expressed in the contract. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (orig. proceeding) (per curiam).  To do so, we consider the entire contract and try to harmonize and give effect to all of its provisions so that none will be rendered meaningless and no single provision will be given controlling effect.  *Id.*  If the relevant rules of contract construction give the contract a definite legal meaning, then we construe it as a matter of law. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).  If the contract is still subject to more than one reasonable interpretation after applying the relevant rules, then the contract is ambiguous, and the parties' intentions present a question of fact.  *See El Paso Field Servs, L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012).

---

[3] Emphasis added.

[4] James and Gidget also argue that [they] agreed that James carry the responsibility and Gidget reap the benefits."  We note that because James and Gidget were held jointly and severally liable, James's ability to comply with any such agreement with Gidget by paying the entire amount himself is unaffected.

12

**A.** **There is legally sufficient evidence that James breached the Master Lease with Campbell.**

The trial court impliedly found that James breached the Master Lease in two ways: by failing to comply with his maintenance-and-repair obligations and by failing to pay additional rent in an amount equal to the property's 2006 pre-sale ad valorem taxes. Because it found that James breached his maintenance-and-repair obligations, the trial court concluded that Campbell and DDK validly terminated the Master Lease. Because the trial court found that James breached his obligation to pay additional rent, it awarded Campbell damages. We conclude that the evidence is legally sufficient to support each of these implied findings.

> *1.* *There is legally sufficient evidence that James breached the Master Lease by failing to maintain and repair the property.*

James and Gidget contend that James's only maintenance-and-repair obligation was to perform repairs that were required for the property's use. In making this argument, they rely on the following language from the Master Lease: "When used herein, the term 'repair' shall include . . . any work ordinarily required as a condition to the continued use of the Premises." They then argue that because there is no evidence that Hayes had to discontinue using the property, there is no evidence that James failed to perform the required repairs. There are at least two problems with this interpretation.

First, James and Gidget read this provision as though it said that "the term 'repair' *shall be limited to*" the matters listed, rather than "*shall include*" them. This is contrary to the generally accepted meaning of the word "include." *See Republic Ins. Co. v. Silverton Elevators, Inc.*, 493 S.W.2d 748, 752 (Tex. 1973) ("Being preceded by the words 'shall include,' there is no hint of limitation or restriction in the definition."); *El Paso Elec. Co. v. Safeway Stores, Inc.*, 257 S.W.2d 502, 506 (Tex. Civ. App.—El Paso 1953, writ ref'd n.r.e.) ("The words

13

'including' and 'includes' have been said in their generally accepted use to be terms of enlargement and not of limitation."); *cf.* TEX. GOV'T CODE ANN. § 311.005(13) (West 2013) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."). Under the plain meaning of the sentence, then, this is not an exhaustive list. "Repair" includes more than the performance of "work ordinarily required as a condition to the continued use" of the property.

Second, James was required to do more than "repair." We must read the contract as a whole, and James and Gidget's interpretation would render meaningless the remainder of the Master Lease's language addressing the parties' respective maintenance-and-repair obligations. The relevant provisions are as follows:

> 8.01 <u>Tenant's [James's] Duty to Maintain</u>. Tenant, at its sole cost, risk, expense and liability shall keep and maintain in good repair all of the Premises. When used herein, the term "repair" shall include all necessary replacements, renewals, alterations, additions, betterments and any work ordinarily required as a condition to the continued use of the Premises. . . . Tenant shall permit no waste, damage or injury to the Premises; and Tenant shall initiate and carry out a program of regular maintenance and repair of the Premises. Tenant's obligations under this Article of the Lease shall include but not be limited to repairing and maintaining: (i) items as are required by any governmental agency having jurisdiction thereof (whether the same is ordinary or extraordinary, foreseen or unforeseen); (ii) the interior and exterior of the entire building, including all utility meters, plumbing, pipes and conduits, all fixtures, heating, ventilating and air conditioning equipment, sprinkler equipment and other equipment within the Premises, all Tenant's signs, locks, and closing devices, and all of the grounds and paving; (iii) all plate glass and other glass (any glass broken shall be promptly replaced by Tenant with glass of the same kind, size and quality). . . . Any warranties obtained by Landlord in connection with the construction of the building shall be

14

assigned to Tenant so that Tenant can enforce same, and Landlord shall cooperate in the enforcement of said warranties.

8.02 <u>No Maintenance Required of Landlord [Campbell]</u>. Landlord shall have no obligations whatsoever to maintain or repair all or any portion of the Premises, including but not limited to the building and other improvements.

James and Gidget do not explain how their argument for a restricted definition of the word "repair" can be harmonized with James's broad duty to "permit no waste, damage or injury to the Premises," but instead to "initiate and carry out a program of regular maintenance" over "the interior and exterior of the entire building" and "all of the grounds and paving."[5] Moreover, they do not contend that James complied with these duties; they do not even mention that the Master Lease contains any such language. Instead, they rely on their restricted interpretation of the word "repair," and argue simply that when determining whether James breached the Master Lease, the question of whether the property needed repair is beside the point, because so long as Hayes was able to continue using the property, James's "duty to effectuate repairs . . . was never triggered." This interpretation of the Master Lease, however, is contrary to unambiguous language in the contract requiring James to carry out a regular program of maintenance and repair.

The evidence is undisputed that James did not comply with these duties. Campbell produced evidence that the property's condition deteriorated over time due to neglected maintenance, and James admitted at trial that the only amounts that he or Gidget expended for the property's maintenance and repair were those addressed in Hayes's settlement agreement with Gidget regarding repairs to the

---

[5] *See, e.g.*, *R. C. Bowen Estate v. Cont'l Trailways, Inc.*, 152 Tex. 260, 263, 256 S.W.2d 71, 72 (1953) ("Waste is an injury to the reversionary interest in land caused by the wrongful act of a tenant or other party rightfully in possession" and "includes injury resulting from failure to exercise reasonable care in preserving the property.").

roof.

We therefore conclude that there is legally sufficient evidence that James breached this part of the Master Lease. Having rejected James and Gidget's position that James was obligated to perform only those repairs that were required as a condition to the property's continued use, we do not address their additional arguments that are built on the same foundation.[6]

### 2. *There is legally sufficient evidence that James breached the Master Lease by failing to pay additional rent equal to the 2006 ad valorem taxes.*

The Master Lease further provided that "Tenant [James] shall pay to Landlord [Campbell], in addition to the rent above reserved and as Additional Rent, all taxes . . . taxed or imposed on or to Landlord with respect to, or based solely on valuation of, the Leased Premises . . . during the term of this Lease." James admitted at trial that he was required to make payments to Campbell for the ad valorem taxes assessed on the property, and that he did not pay the amounts owed for tax year 2006. He nevertheless argues that Campbell is not entitled to recover the damages awarded because (a) she did not mention taxes in her pleading, (b) the amendment to the Master Lease when a portion of the property was sold eliminated James's obligation to make this payment, (c) there is legally insufficient evidence of the amount of the 2006 pre-sale ad valorem taxes, and (d) Campbell subsequently transferred the Master Lease and the property to DDK.

---

[6] These include their arguments that (1) the conditions about which Campbell complained preexisted the Master Lease "and therefore could not affect the *continued* use of the property"; (2) the parties' agreement at the Master Lease's inception that the property was "in tenantable condition" constituted confirmation "that the condition of the property was conducive to its continued use"; and (3) because James did not breach his repair obligations, Campbell had no grounds to terminate the Master Lease, so that her attempt to do so was itself a breach of the contract.

16

**(a)    Campbell was not required to address taxes in her pleading.**

James argues that taxes are special damages that Campbell was required to plead, and that Campbell did not include any special damages in her pleading. Whether particular damages must be specifically pleaded depends on whether they constitute general damages (also known as "direct damages") or special damages (also known as "consequential damages"). *See* TEX. R. CIV. P. 56 ("When items of special damage are claimed, they shall be specifically stated."); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (sub. op.) (using the terms "direct damages" and "consequential damages"); *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.*, 543 S.W.2d 402, 405 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (using the terms "general damages" and "special damages"). The distinction turns on whether the damages "usually" or "necessarily" flow from the wrongful act. *See Arthur Andersen & Co.*, 945 S.W.2d at 816 (explaining that "[d]irect damages are the necessary and usual result of the defendant's wrongful act," whereas consequential damages "result naturally, but not necessarily, from the defendant's wrongful acts"); *Anderson Dev. Corp.*, 543 S.W.2d at 405 (stating that "[g]eneral damages are those which naturally and necessarily flow from a wrongful act," whereas "[s]pecial damages arise naturally but not necessarily from the wrongful act"). General damages need not be pleaded because they "are so usual an accompaniment of the kind of breach alleged that the mere allegation of the breach gives sufficient notice" that such damages were sustained. *Hess Die Mold, Inc. v. Am. Plasti-Plate Corp.*, 653 S.W.2d 927, 929 (Tex. App.—Tyler 1983, no writ). Special damages, on the other hand, "are so unusual as to normally vary with the circumstances of each individual case, and must be shown to have been contemplated or foreseen by the parties." *Id.*

In support of the assertion that Campbell was required to specially plead for

17

the recovery of taxes, James cites *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655 (Tex. 1979). Although the taxes sought in *Smith* constituted special damages, the case is distinguishable. The plaintiffs in the *Smith* case sued to rescind a contract to purchase real property because the seller failed to disclose that the property was encumbered by a flood easement. *Id.* at 656. The plaintiffs sought restitution of the purchase price and the taxes paid on the property. *Id.* The court explained that "[r]escission is an equitable remedy and, as a general rule, the measure of damage is the return of the consideration paid, together with such further special damage or expense as may have been reasonably incurred by the party wronged on account of the contract." *Id.* at 660. The taxes paid by the plaintiffs in that case were the natural, but not the necessary, result of the defendant's wrongful act.

Unlike the unpaid taxes in *Smith*, the damages at issue here were the necessary result of James's breach of contract. This is so because the contract itself required James to pay "additional rent" equal to the property's ad valorem taxes. A breach of the contractual obligation to pay a certain amount necessarily gives rise to damages in the unpaid amount.[7] Because these are general damages, Campbell was not required to specifically plead for them.

---

[7] In a related argument, James points out that the trial court did not mention ad valorem taxes in its findings of fact. The trial court stated in its judgment, however, that James breached the Master Lease, and that Campbell is entitled to recover $61,823.12, an amount that is identical to the unpaid additional rent for the 2006 ad valorem taxes. Although findings of fact and conclusions of law generally are to be stated in a document separate from the judgment, *see* TEX. R. CIV. P. 299a, those stated in a judgment nevertheless have probative value if they do not conflict with those stated in a separate document. *See Bryan Indep. Sch. Dist. v. Cune*, No. 14-09-00062-CV, 2010 WL 2541841, at *3 (Tex. App.—Houston [14th Dist.] June 24, 2010, pet. denied) (mem. op.); *Baltzer v. Medina*, 240 S.W.3d 469, 474 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The trial court did not address this claim further in its separately issued findings of fact and conclusions of law, and the parties did not request additional or amended findings. *See* TEX. R. CIV. P. 298. Although James implies that the trial court's findings omit an element necessary for Campbell to recover on her breach-of-contract claim, the unrequested elements are supplied by the presumption in support of the judgment. *See* TEX. R. CIV. P. 299.

**(b)** **The amendment to the Master Lease did not eliminate James's obligation to pay additional rent in the amount of the pre-sale ad valorem taxes.**

James also points out that the Master Lease was amended when Campbell sold a portion of the property in 2006, and he contends that the amendment eliminated his duty to pay additional rent in the amount of the ad valorem taxes. This is not supported by the record. The amendment simply changed the definition of "premises" to exclude the part of the premises that was sold. The amendment did not become effective at the beginning of the tax year; by its terms, the amendment became effective when the property sale took place in October 2006. Thus, the amendment did not change James's contractual obligation to pay Campbell additional rent in an amount equal to the ad valorem taxes assessed over the entirety of the property for the part of the tax year that preceded the sale.

**(c)** **There is legally sufficient evidence of the amount of the 2006 ad valorem taxes.**

James states that there is less than a scintilla of evidence to support the damages awarded to Campbell. Campbell testified, however, that taxes of $61,823.12 were assessed against the property for the part of tax year 2006 that predated the property sale. She also introduced into evidence a 2007 demand letter to James from Campbell's attorney, stating the same total and separately listing the amounts assessed by each taxing unit. This uncontroverted evidence about the amount of the taxes assessed is legally sufficient to support the trial court's damage award in Campbell's favor.

**(d)** **Campbell's transfer of the Master Lease does not bar her recovery for its pre-transfer breach.**

James further asserts that because Campbell transferred the property and the Master Lease to DDK, she cannot recover for James's breach of the obligation to pay additional rent in the amount of the unpaid 2006 ad valorem taxes. In other

19

words, he contends that because Campbell transferred the property and the contract in 2010, she cannot recover on a breach-of-contract claim that accrued when the payment was due in 2007. He does not contend, however, that Campbell assigned her cause of action to DDK, and he cites no evidence or authority in support of his assertion. This argument therefore is waived. *See* TEX. R. APP. P. 38.1(i).

**B.    James and Gidget failed to conclusively prove that Campbell's failure to give advance notice of her intent to transfer the property was a prior material breach.**

James and Gidget next contend that the trial court erred in finding that Campbell did not breach the Master Lease. Specifically, they argue that Campbell breached the following provision:

> If at any time during the term of this Lease, Lessor [Campbell] desires to mortgage or transfer, convey or sell the Premises or any part thereof, then prior to Lessor's mortgaging or placing the Premises or any part thereof on the market for sale, Lessor shall first notify Tenant [James] in writing of such intention . . . .

The Master Lease provided that after such notice was given, James would have thirty days in which to give Campbell written notice of his intention to buy the Premises and to negotiate the terms of the sale. If no agreement was reached by the end of that time, Campbell was "free to offer such interest for sale to third party, bona fide purchasers." It is undisputed that Campbell gave James no advance notice before she transferred the property and the Master Lease to DDK, a limited liability company owned and managed solely by Campbell.

But the question before us is not whether Campbell failed to comply with this provision, but whether she was required to comply. This is so because when one party materially breaches a contract, the other party to the contract is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). In accordance with

20

this principle, James and Gidget argue that "[b]ecause Campbell's breach *was prior to any other alleged breach*, the trial court should have ruled in favor of James and Gidget and entered judgment against Campbell." (emphasis added). Their argument, however, is predicated on the success of their contention that James did not breach the Master Lease, so as to make Campbell's failure to comply with this provision the first material breach. But as we previously explained, the trial court did not err in concluding that James breached the Master Lease. Thus, the determinative question before us is not whether Campbell failed to give advance notice of her intent to transfer the Master Lease and the property— unquestionably, she did not—but whether she was required to comply with the provision given James's breach of his maintenance-and-repair obligations.[8] If James had not yet breached those obligations when Campbell transferred the property and the Master Lease, then she was required to comply with that provision. If he had already materially breached those provisions of the contract, however, then Campbell was no longer required to comply with it. *See Advanced Personal Care, LLC v. Churchill*, 437 S.W.3d 41, 46 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

We conclude that the following evidence is legally sufficient to support the implied finding that James materially breached his maintenance-and-repair obligations before Campbell transferred the Master Lease and the property to DDK:

---

[8] Although James breached the Master Lease in 2007 by failing to pay additional rent in an amount equal to the 2006 ad valorem taxes, it is undisputed that, despite the breach, Campbell continued to try to enforce James's obligations under the contract and specifically stated that although she reserved her right to sue for damages, she was not terminating the Master Lease at that time. *See Advanced Personal Care*, 437 S.W.3d at 48. The Master Lease remained in effect until it was terminated in 2010 for the stated reason that James had breached his maintenance-and-repair obligations.

- Campbell's attorney wrote a letter to James's attorney on March 25, 2010, demanding that James begin repairing "all defects of the Premises" within fifteen days. The only defects specifically mentioned were the collapsing awning and the sinkhole in the parking lot.

- James's attorney responded on April 9, 2010 that Hayes was making arrangements to complete the repairs.

- Campbell's attorney again wrote to James's attorney on April 20, 2010, and pointed out that under the terms of the Master Lease, "Tenant [James] gets 30 days' written notice before a failure to perform covenants becomes an Event of Default." Because Campbell gave written notice on March 25, 2010 of the need to repair the sinkhole and the awning, James was given until April 26, 2010 "to take the actions required under the Lease." Campbell's attorney enclosed a report of the property's inspection by Professional Engineering Inspections, Inc. and stated that James had thirty days—that is, until May 21, 2010—to address those additional items.

- On April 26, 2010—the deadline to address the sinkhole and the awning—James and Gidget's attorney responded, "The alleged notice is rejected," claiming no obligation to repair.

In sum, there is legally sufficient evidence that James breached the Master Lease on April 26, 2010 by repudiating his contractual responsibility to maintain and repair the property. Inasmuch as this was the date by which James was required to respond to the first of Campbell's maintenance-and-repair demands and Campbell transferred the property to DDK the same day, the trial court was entitled to infer that Campbell did so in response to—and thus, *after*—James's denial of his contractual obligations to repair and maintain the property. Upon James's material breach of the Master Lease, Campbell was entitled to treat the

22

contract as terminated. Because she no longer was required to comply with the contractual obligation to give James advance notice of her intent to transfer the property, her failure to do so was not a breach of the contract.[9] We overrule James and Gidget's first two issues.

## VI. CLAIMS REGARDING THE SUBLEASE OF THE PROPERTY TO HAYES

James and Gidget next challenge the judgment against them in Hayes's favor, arguing that the trial court erred both in finding that James breached the Sublease with Hayes, and in finding that Hayes did not breach the Sublease. Although James and Gidget do not expressly challenge the trial court's finding that Gidget breached the Sublease with Hayes, they argue that Gidget was not a party to a contract with Hayes. As previously discussed, however, we have concluded that the evidence is legally sufficient to support the trial court's finding that Gidget became the sublandlord under the Sublease in November 2008; thus, our discussion about the parties' claims and counterclaims for breach of the Sublease applies to Gidget as well as to James.

**A.      There is legally sufficient evidence that James and Gidget breached the Sublease.**

James and Gidget's arguments that they did not breach the Sublease with Hayes are predicated on the success of their challenge to the judgment in Campbell's favor. This is because the Sublease expressly provides that an uncured default of the Master Lease is also a default of the Sublease by the "sublandlord." James and Gidget accordingly argue that the Master Lease was not breached, and thus, the Sublease was not breached. We have held, however, that there is legally

---

[9] James and Gidget's remaining arguments in support of this issue are predicated on the success of their contentions that James did not breach the Master Lease, so that the termination of the Master Lease was the first breach. Because we have rejected this premise, we do not address James and Gidget's remaining arguments in support of this issue.

23

sufficient evidence to support the trial court's findings regarding breach of the Master Lease, and the same evidence is legally sufficient to support the trial court's conclusion that James and Gidget breached the Sublease.

**B.** **James and Gidget failed to conclusively establish that Hayes breached the Sublease.**

James and Gidget also assert that the trial court's finding that James breached the Master Lease conflicts with the finding that Hayes did not breach the Sublease. They contend that Hayes's duties of maintenance and repair under the Sublease were broader than James's duties under the Master Lease, because "[u]nlike the Master Lease, the Sublease did not limit the term 'repairs,' to repairs necessary for the continuing use of the property." They therefore reason that if the failure to perform repairs were a breach of the Master Lease by James, then the same failure also would have been a breach of the Sublease by Hayes. We already have rejected that argument: James's maintenance-and repair obligations under the Master Lease were not limited to repairs that were necessary for Hayes's continued use of the property.

James and Gidget additionally contend that Hayes had the same repair obligations under the Sublease that James had under the Master Lease. Specifically, they assert that section 5 of the Sublease incorporates the terms of the Master Lease and substitutes "Sublandlord" for "Landlord" and "Subtenant" for "Tenant." According to James and Gidget, "[n]one of the [Master Lease's] Articles concerning maintenance and repair were excepted from this clause." But once again, their interpretation is contrary to the plain language of the contract.

First, in relying on section 5 of the Sublease, James and Gidget have failed to mention the following language:

This Sublease is subject and subordinate to the Master Lease. The

24

terms, conditions and respective obligations of Sublandlord and Subtenant to each other under this Sublease shall be the terms and conditions on the Master Lease *except to those provisions of the Master Lease which are contradicted by this Sublease*, in which event the terms of this Sublease shall control over the Master Lease. *In addition, but not by way of limitation, the following provisions of the Master Lease shall not apply to the rights and obligations of Sublandlord and Subtenant:* Sections 4.05, *8.01, 8.02*, 13.01, 13.02, 15.01, 20.02, 22.01 (f), and 23.01-23.03.[10]

As previously discussed, Articles 8.01 and 8.02 of the Master Lease deal with the respective maintenance-and-repair obligations of the Master Lease's landlord and tenant; thus, the repair-and maintenance obligations that James agreed to perform as the tenant under the Master Lease were not passed through to become subtenant Hayes's obligations under the Sublease. Moreover, section 14 of the Sublease imposes the following additional maintenance-and-repair obligations on the sublandlord:

14. Repair and Maintenance by Sublandlord [i.e., James and then Gidget]. . . . Sublandlord shall be responsible for compliance of the Subleased Premises with all present and future laws relating to health, safety, and access for the disabled and for all latent defects in the Subleased Premises. Furthermore, if any condition of the Subleased Premises existing prior to Subtenant's occupancy thereof is required by applicable law to be corrected and such correction is not a result of Subtenant's particular use of the Subleased Premises . . . , Sublandlord shall be responsible for correcting such condition, at its sole cost and expense, and without reimbursement by Subtenant. Sublandlord warrants that the air conditioning and heating systems, electrical system, mechanical system, and plumbing system will be in good working order on the Sublease Commencement Date.

Hayes presented evidence at trial that it discovered in 2007 (when James was the sublandlord) that there were a half-dozen open building permits on the premises, and Hayes was unable to obtain a certificate of occupancy until all of the

---

[10] Emphasis added.

code violations were remedied. The matters that had to be repaired included latent defects and violations of code provisions related to health and safety, the electrical system, and the plumbing system. Hayes also found more problems that needed repair when Gidget was the sublandlord. Although these were the sublandlord's obligation, neither James nor Gidget accepted responsibility, and Hayes eventually offset the cost of repairs against its rent payments, as it was entitled to do under the terms of the Sublease. We accordingly hold that the evidence is legally sufficient to support the trial court's finding that Hayes did not breach the Sublease by failing to make repairs or by offsetting the cost of repairs against its rent payments.[11] Thus, we overrule James and Gidget's third issue.

## C. There is legally sufficient evidence to support Gidget's joint and several liability for Hayes's attorney's fees.

The Sublease provides that "Sublandlord [James and then Gidget] shall indemnify Subtenant [Hayes] for and hold Subtenant harmless from and against all costs, expenses (including reasonable attorneys' fees), fines, suits, claims, demands, liabilities and actions resulting from any breach, violation or nonperformance of any covenant or condition hereof . . . ." In accordance with this provision, the trial court held James and Gidget jointly and severally liable for Hayes's attorney's fees. Although Gidget challenges this portion of the judgment, she does not argue that she should be liable only for costs associated with the time that she was the Sublandlord. Instead, she repeats the legal-sufficiency arguments

---

[11] James and Gidget similarly contend that by offsetting the cost of repairing code violations against its rent, Hayes also breached its settlement agreement with Gidget. This is really a restatement of the argument that Hayes breached the Sublease, because the settlement agreement is a modification of the Sublease. Although the settlement agreement included provisions raising Hayes's rent so that Hayes bore half of the cost of roof repairs, the settlement agreement did not modify the provisions in the Sublease that (a) required the sublandlord [James and then Gidget] to pay for these code-violation repairs, or (b) permitted Hayes to deduct the costs of the code-violation repairs from its rental payments.

26

previously discussed.  Gidget argues only that there is no legal basis for that portion of the judgment because (1) "Hayes did not have a lease or any other contract with Gidget Archer," and (2) the evidence is undisputed that only the benefits of the Sublease were assigned to her.

We already have considered and rejected each of these arguments; thus, this issue presents nothing further for us to review.  We accordingly overrule this issue.

## VII. CONCLUSION

Having overruled each of the issues presented, we affirm the trial court's judgment.


/s/     Tracy Christopher
Justice


Panel consists of Justices Christopher, Donovan, and Wise.