**Opinion filed May 18, 2023**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-21-00266-CV**

_____

**NOONER HOLDINGS, LTD., Appellant**

**V.**

**ABILENE VILLAGE, LLC; PILLAR ABILENE VILLAGE INVESTORS, LLC; PCG MANAGEMENT, INC.; AND BRIAN MOORE, Appellees**

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 51183-A**

**O P I N I O N**

This case involves the sale of commercial property, with an estimated one million dollars in alleged undisclosed parking lot defects, pursuant to a negotiated Purchase and Sale Agreement containing an "as is" provision, as well as a parking lot repair clause and due diligence inspection provisions. Appellant, Nooner Holdings, Ltd., as buyer of a shopping center, challenges the trial court's grant of a

take-nothing summary judgment against Appellant on its claims for breach of the sales contract, fraud, fraudulent inducement, and statutory fraud by Appellees—Abilene Village, LLC; Pillar Abilene Village Investors, LLC; PCG Management, Inc.; and Brian Moore. We affirm.

*Factual and Procedural History*

Appellant alleged that it received less than what it bargained for when it signed a "Purchase and Sale Agreement" with Abilene Village regarding a commercial property in Abilene. Although the property included shops and tenants, the issues on appeal center around the parking lot. The parking lot, less than three years old when negotiations took place, had previously begun to exhibit physical deformities because it did not conform to the originally specified construction standards. A geotechnical report issued by Terracon (the Terracon survey) confirmed that to properly repair the parking lot, to meet the original construction standards, would cost approximately one million dollars. Abilene Village initially discussed making the needed repairs to help sell the property, but changed course two weeks later. Meeting minutes from November 6, 2018, noted that "Pillar [Abilene Village Investors] is trying to sell [the] property so parking lot will not be repaired to full scope."

It is undisputed that the Purchase and Sale Agreement is a valid and enforceable contract. Appellant acknowledged and confirmed in the Purchase and Sale Agreement that it was "a sophisticated purchaser of real property." During sale negotiations, the parties discussed the parking lot. The unsworn "Declaration" of Sean Nooner, president of Nooner Holdings, Ltd. stated that Appellees revealed and agreed to repair some apparent "alligatoring" (i.e. visible damage that resembles the skin of an alligator) located in a small portion of the parking lot. Appellees did not say that this was the only damage to the parking lot, but neither did they offer the

full truth: that this "alligatoring" was likely a symptom of the fundamental defects in the parking lot. The parties negotiated a "Parking Lot Work" clause that was included in their agreement. The language contained in this clause, section 15.2(l) of the Purchase and Sale Agreement, is important.

> <u>Parking Lot Work</u>. Seller and Buyer acknowledge that there are defects in the parking lot located upon the Land. Seller, at its cost, shall cause repair work to be performed on the parking lot during the Feasibility Period, as and to the extent determined necessary by Seller in its sole and absolute discretion. If Buyer is unsatisfied with such work for any reason, Buyer may terminate this Agreement during the Feasibility Period in accordance with Section 8.4 above.

Parking lot defects were acknowledged. Any repair work to be performed by Appellees was only to the extent determined necessary by Appellees in their "sole and absolute discretion," and if unsatisfied Appellant was entitled to terminate the entire agreement up until closing.

While there is other relevant contract language, three other notably important clauses were negotiated as well: a comprehensive "As-Is" clause,[1] "Due Diligence

---

[1]Section 15.1(g), the as-is clause, provides:

> <u>As-Is</u>. Buyer is a sophisticated purchaser of real property and, other than the representations, warranties, and covenants expressly stated in this Agreement or in the instruments executed and delivered by Seller at the Closing (the "**Express Representations**"), Seller has not made, does not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present, or future, of, as to, concerning, and/or with respect to the Property and/or the Property Information, including, without limitation: (i) the value, nature, quality, or condition of the Property, including, without limitation, the water, soil, and geology, . . . (v) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property, (vi) the manner or quality of the construction or materials, if any, heretofore incorporated into the Property, (vii) the manner, quality, state of repair, or lack of repair of the Property . . . or (x) any other matter with respect to the Property and/or the Property Information. Buyer further acknowledges and agrees that, except for the Express Representations, Buyer is relying entirely on Buyer's own investigations and examinations as to the physical condition and every other aspect of the Property and/or the Property

Review" clause and an investigation clause.[2]  The "As-Is" clause, as the name implies, indicates that the buyer is accepting the risk of all the faults associated with the property and "accepts and agrees to bear all risks with respect to all attributes and conditions, latent or otherwise, of the Property."  The investigation clause here

---

Information, including, without limitation, those matters set forth in clauses (i) through (x) above.  Buyer acknowledges that, subject to the Express Representations, it has performed, or before the Closing will perform, any and all inspections Buyer deems necessary or appropriate for Buyer to be satisfied with the acceptability of the Property.  Buyer acknowledges that, except for the Express Representations, Buyer is purchasing the Property on an "AS-IS", "WHERE-IS", and "WITH ALL FAULTS" basis, without any implied warranties, and, except for the Express Representations, Buyer accepts and agrees to bear all risks with respect to all attributes and conditions, latent or otherwise, of the Property.  Except for the Express Representations, Seller does not warrant any of the Property to be free from defects.  The provisions of this Section 15.1 shall survive the Closing and shall not merge with the Deed.

[2]Section 8.1, relating to due diligence review, provides in relevant part:

**Due Diligence Review**.  During the Feasibility Period, Buyer, at its sole cost and expense, shall have the right to conduct such studies and investigations of such matters as Buyer deems necessary and appropriate to determine the suitability of the Property for Buyer's purposes (a **"Due Diligence Review"**), including, without limitation, of the following:

a)  inspecting, surveying, making engineering, architectural and environmental studies, assessments and/or audits, testing the soil, soil compaction and grading elevations, testing for the presence of naturally occurring radioactive materials, evaluating any wetlands or waters of the United States, and otherwise determining the condition of the Property and prior uses of the Property;

. . . .

i)  performing all such other inspections and investigations and obtaining such other approvals, as shall be deemed necessary by Buyer for its proposed development and use of the Property.

Section 15.1(f), the investigation clause, provides as follows:

Investigation.  Prior to the Closing, Buyer shall have made its own examination, inspection and investigation of the condition of the Property (including, without limitation the subsurface thereof, and all soil, environmental, engineering and other conditions which may affect construction thereon) and all matters affecting the development of the Property as it deems necessary or appropriate, and Buyer is entering into this Agreement and purchasing the Property based upon the results of such inspections and investigations and not in reliance on any statements, representations, or agreements of Seller not contained, or referenced, in this Agreement.

4

indicates that Appellant was responsible for making its own examination, inspection, and investigation of the condition of the property—"purchasing the Property based upon the results of such inspections and investigations and not in reliance on any statements, representations, or agreements of Seller not contained, or referenced, in this Agreement." Despite the language of the parties' negotiated agreement, there is no evidence that Appellant made any attempt to survey the parking lot, request more information from Abilene Village, or further inspect the premises. Contrary to the cited terms of the Purchase and Sale Agreement, Appellant contends that it relied upon Abilene Village's statements—and failure to disclose—concerning the parking lot when it signed the contract on January 8, 2019. Appellant realized too late that the scope of the parking lot defects extended well beyond the surface defect that Abilene Village had affirmatively identified.

Appellant first filed suit against those who built the parking lot (the construction defendants), then joined Appellees to the suit in its fourth amended petition on March 31, 2021. In response, Appellees filed their first motion for summary judgment. Without a ruling on the first motion, Appellees filed a second motion for summary judgment—on traditional grounds only. After a hearing, the trial court granted Appellees' second motion for summary judgment. Appellees then filed an unopposed motion to sever their claims from the construction defendants; the severance was granted, providing a final, appealable judgment.

Appellant raises five issues on appeal.[3] We have summarized them below.

1. The trial court erred when it granted Appellees' second motion for summary judgment because the arguments from the first motion for summary judgment were not "expressly presented" in the second motion.

---

[3]There were initially six issues, but in its reply brief Appellant withdrew its sixth issue—a contention regarding an award of attorney's fees.

2. The trial court erred when it granted the second motion for summary judgment as to Appellant's claims for fraud.

3. The trial court erred when it granted the second motion for summary judgment as to Appellant's claims for breach of contract.

4. The trial court erred when it granted the second motion for summary judgment on its claims of derivative liability as to the individual appellees named in its suit based on theories of direct actor liability, respondeat superior/vice principle, beneficiary of fraud and ratification and conspiracy.

5. The trial court erred when it granted the second motion for summary judgment because Appellees failed to plead and prove the elements of the affirmative defense of release.

Appellees' second motion for summary judgment contains sufficient grounds to affirm the trial court's judgment. We do not address Appellant's first issue regarding Appellees' first motion for summary judgment because the trial court specifically granted Appellees' second motion for summary judgment. The merits of Appellant's last two issues regarding its derivative liability claims and its release of Brian Moore are dependent on viable claims of fraud and breach of contract—issues two and three.

*Standard of Review*

We review de novo a trial court's grant of summary judgment. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively

6

negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* TEX. R. CIV. P. 166a(b), (c). When the trial court's order does not specify the grounds relied upon, the trial court's grant of summary judgment will be affirmed on any grounds advanced by the movant that are meritorious. *Barker v. Roelke*, 105 S.W.3d 75, 82 (Tex. App.—Eastland 2003, pet. denied).

While a party may not like the consequences of the terminology they chose in negotiating a contract, we must enforce it as written, particularly as between sophisticated parties. "We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 67 (Tex. 2014) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012)); *see also Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.) ("In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose."). "[S]ophisticated parties have broad latitude in defining the terms of their business relationship." *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (quoting *FPL Energy, LLC*, 426 S.W.3d at 67). "[C]ourts are obliged to enforce the parties' bargain according to its terms." *Id.* (citing *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.")). "[C]ourts may not rewrite a contract under the guise of interpretation." *Id.*; *see also Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. [Comm'n Op.] 1942) ("Parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own

7

oversights and failures in nonobservance of obligations assumed." (quoting *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911))); *E. Tex. Fire Ins. Co. v. Kempner*, 27 S.W. 122, 122 (Tex. 1894) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.").

*Analysis*

In Appellant's second issue, it argues that summary judgment was improper as to its claims of statutory fraud, common law fraud, and fraudulent inducement. It argues that Appellees failed to conclusively negate an element of Appellant's claims of false representation and justifiable reliance.

Section 27.01(a) of the Texas Business and Commerce Code creates a statutory fraud cause of action in a real estate transaction. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2023). It requires, in relevant part:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract[.]

Common law fraud requires (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or it was made recklessly, without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners,*

8

*Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (citing *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)). A party claiming fraudulent inducement must show that (1) the other party made a material representation, (2) the representation was false and was either known to be false when made or was made without knowledge of its truth, (3) the representation was intended to be and was relied upon by the injured party, and (4) the injury complained of was caused by the reliance. *Id.*

Appellant argues that based on Appellees' partial disclosure—that of defects in a limited area of the parking lot—Appellees had a duty to disclose the full extent of the parking lot defects known to Appellees. Appellant also argues that the language of the contract does not contain the clear language necessary to disclaim Appellant's reliance on the partial disclosure as a matter of law. Importantly, our analysis is limited to sophisticated parties in the negotiation of non-boilerplate contractual provisions that allocate relevant risks and duties between the parties where no direct misrepresentation has been made.

## I. *No Further Duty to Disclose*

Appellant claims that the failure to disclose the full range of damage to the parking lot met the element of false representation. Failing to disclose information is equivalent to a false representation when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)). "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford*, 48

9

S.W.3d at 755. "Whether such a duty exists is a question of law." *Id.* "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

Appellant's claims of fraud, as pled in its multiple common law and statutory forms, all require proof of a misrepresentation. *See Mecedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 556, 559, 563 (Tex. 2019) (where the evidence indicated that none of the defendants actually made any oral representation about plaintiff's ability to move the dealership but, rather, due to other events and circumstances, plaintiff "*assumed* that he would eventually be able to relocate") (emphasis added). To be clear, similar to the facts presented in *Mercedes-Benz*, no actual misrepresentation was made to Appellant that the parking lot was free of defects.

But Appellant advances two theories that it claims would impose on Appellees a duty to disclose—and failure thereby to constitute a misrepresentation. First, Appellant cites to authority that states a seller of real estate has a duty to disclose material facts that (1) would not be discoverable by the exercise of ordinary care and due diligence by the purchaser or (2) a reasonable investigation and inquiry would not uncover. *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). This duty has held strong in the common law since *Smith*. *See Domel v. Birdwell*, No. 11-12-00200-CV, 2014 WL 4347815, at *6 (Tex. App.—Eastland Aug. 29, 2014, pet. denied) (mem. op.); *Tukua Invs., LLC v. Spenst*, 413 S.W.3d 786, 801 (Tex. App.—El Paso 2013, pet. denied); *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App.—Dallas 2010, pet. denied). Appellees attempt to distinguish this duty as being

only applicable to sales of residential real estate.[4] Ignoring the fact that "residential" is conspicuously absent from the rule each time it is stated, some courts have held that this duty to disclose applies to commercial real estate transactions. *See Uribe v. Briar-Ridge, LLC*, No. 13-20-00167-CV, 2021 WL 6129133, at \*6 (Tex. App.—Corpus Christi–Edinburg Dec. 29, 2021, pet. denied) (mem. op.); *Tukua Invs.*, 413 S.W.3d at 800–801; *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.).

Appellant relies on case law to support its argument that Appellees had a duty to disclose material facts, but Appellant fails to provide evidence that the parking lot defects of which it complains *would not have been discoverable* as required by that same case law *by the exercise of ordinary care and due diligence by the purchaser, or which a reasonable investigation and inquiry would not uncover*. *See Smith*, 585 S.W.2d at 658. Appellant provides no evidence of any due diligence steps taken or any effort to inspect or investigate at all to meet that common law element—much less Appellant's contractually accepted duties of inspection or investigation.[5] Appellant provides no basis upon which we could hold that a reasonable investigation and inquiry would not have led it down the same path as that taken by Appellees to ultimately have a third-party inspection to uncover parking lot defects. "And when a party fails to exercise such diligence, it is 'charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly

---

[4]In their brief, Appellees assert that there is no common law duty to disclose absent a fiduciary duty. So confident are the Appellees in their assertion, that they filed a forty-two-page motion for damages for Appellant's purported filing of a frivolous appeal. *See* TEX. R. APP. P. 45. Appellees filed their Rule 45 motion just days after filing a supplemental filing—one this court requested regarding the duty to disclose. Texas courts have often entertained the concept of a common law duty of disclosure. While the matter may not be settled in all fact scenarios, it is certainly far from frivolous. Accordingly, we deny Appellees' motion for damages.

[5]The Texas Supreme Court implies that "greater diligence" would be required of a sophisticated party such as Appellant. *Mercedes-Benz*, 583 S.W.3d at 563.

situated.'" *Mecedes-Benz*, 583 S.W.3d at 563 (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)). There can be no misrepresentation in failing to reveal that knowledge with which Appellant is charged as a matter of law. *Id.* Based on this record and considering the terms of the contract and the circumstances presented, we cannot hold that the trial court erred when it impliedly concluded that, as a matter of law, there was no evidence of a breach of any duty to disclose. Unambiguous terms of a written contract may directly contradict claims of misrepresentation or justified reliance on same—with or without other "red flags"—and may defeat Appellant's claims as a matter of law. *See Mecedes-Benz*, 583 S.W.3d at 558–59

Second, ignoring strong language in the Purchase and Sale Agreement, Appellant argues that when Appellees disclosed the limited "alligatoring" issue in the parking lot, even though it did not do so expressly, it intentionally created a false impression that this "alligatoring" was the *only* damage to the parking lot—a purported false impression upon which Appellant relied. According to Appellant, this false impression created a duty to disclose the full extent of the defects.

It is important to note that we are not merely dealing with common law issues, but also with an agreement that contains specific contractual provisions that directly bear on accepted duties and risks between the parties. The contractual provisions are relevant as to whether, in light of these terms, there is a misrepresentation and/or whether reliance thereon would be justified. These unambiguous contractual terms accepted by Appellant, of course, include the parking lot work clause, the "As-Is" clause, and the due diligence/inspection clauses.

We cannot say that the Texas Supreme Court has adopted a duty of full disclosure based on partial disclosures that are true. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 352 (Tex. 1995) ("This Court has cited section 551

only once, *Smith v. National Resort Communities*, 585 S.W.2d 655, 658 (Tex.1979), but has never embraced it as a rule of law in Texas."). The supreme court may have alluded to a duty to disclose based on incomplete, affirmative disclosures, but each time the question of duty was presented, the case was disposed of on different grounds. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019); *Mercedes-Benz*, 583 S.W.3d at 562 (partial disclosure was claimed to trigger a duty to disclose, but the court emphasized continued refusal to accept *Restatement*, Section 551); *Bradford*, 48 S.W.3d at 755–56. The supreme court did not analyze the duty to disclose in *Bombardier* because the defendant did not dispute the finding of fraud. It merely questioned which plaintiff could recover for fraud. *Bombardier*, 572 S.W.3d at 220. *Mercedes-Benz* and *Bradford* were both disposed of based on a lack of evidence to support section 551's application. *Mercedes-Benz*, 583 S.W.3d at 562–63; *Bradford*, 48 S.W.3d at 756.

Various Texas courts of appeals have generally agreed that a duty to disclose may arise based upon a partial disclosure. *See CLC Roofing, Inc. v. Helzer*, 594 S.W.3d 414, 425 (Tex. App.—Fort Worth 2019, no pet.); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, no writ); *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App.—Dallas 2010, pet. denied). We have also noted that several Texas courts have held that there is a general duty to disclose when a party makes a true disclosure that conveys a false impression. *Domel*, 2014 WL 4347815, at *6. In *Domel*, we held that, in the context of a seller and buyer of a home, "Appellants had a common-law duty to disclose the whole truth, correct any misstatements or false impressions, and disclose material information—like the insurance claim and payment for roof damage—that would not have been discoverable through ordinary and reasonable diligence." *Id.* at *7.

13

Cases that review the issue of duty based on partial disclosure also discuss whether the seller could have reasonably discovered the undisclosed facts themselves. *See Bradford*, 48 S.W.3d at 755; *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995); *Domel*, 2014 WL 4347815, at *7; *Myre*, 307 S.W.3d at 844. It cannot be unreasonable for a seller to assume that a buyer will "trust, but verify" their representations. *See* Restatement (Second) of Torts § 551 cmt. k (1977) ("The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself. . . ."). "In an arm's length transaction, the party alleging fraud must have exercised ordinary care to protect its own interests and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation." *Mercedes-Benz*, 583 S.W.3d at 563 (quoting *Orca Assets*, 546 S.W.3d at 654). We hold that, generally, in an arm's length business transaction, a party that conveys a partial or ambiguous factual statement may have a common law duty to disclose matters known to him to prevent the disclosure from being misleading. But that is not dispositive of any applicable duty or breach thereof in light of the relevant Purchase and Sale Agreement provisions that was agreed to by the sophisticated parties in this case and the risks that they bargained for.

II. *No Justifiable Reliance—Red Flags and Express Contract Terms*

"[A] buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect" in a contract when an "as-is" clause negotiated by sophisticated parties also appears. *Prudential*, 896 S.W.2d at 162. An "as-is" clause is a form of disclaimer of reliance. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997) (citing *Prudential*, 896 S.W.2d at 161–62). The as-is clause agreed to by Appellant contradicts its claim of reliance.

14

An abundance of "red flags" may preclude justifiable reliance as a matter of law. Justifiable reliance is a fact question, but may be negated as a matter of law when circumstances exist under which reliance cannot be justified. *Orca Assets*, 546 S.W.3d at 654. "Red flags" *alone* or direct contradictions in express contract terms *alone* can negate justifiable reliance as a matter of law. *See Mercedes-Benz*, 583 S.W.3d at 559 (citing *Orca Assets*, 546 S.W.3d at 660 n.2). The Purchase and Sale Agreement before us contains both direct contradictions and red flags that negate any justifiable reliance on an alleged misrepresentation through a partial disclosure.

Appellees' second motion for summary judgment focuses on the contention that because of the express, unambiguous statement at the beginning of the parking lot work clause—"there are defects in the parking lot"—the oral statement that a portion of the parking lot was exhibiting "alligatoring" could not have justifiably been assumed to be a denial of any defect in the remainder of the parking lot. We agree, particularly in the context of the other contractual terms examined herein.

"[T]here is no direct contradiction if a reasonable person can read the writing and still plausibly claim to believe the earlier representation." *Orca Assets*, 546 S.W.3d at 659 (finding that seller's representation that the acreage was "open," meaning unleased, was directly contradicted by the negation-of-warranty clause that spoke to a potential "failure of title"). While Appellees' representation regarding the "alligatoring" is claimed to have misled Appellant into believing that this was the only defect in the parking lot, Appellees did not affirmatively represent as much. A sophisticated buyer could read the unambiguous contract language "there are defects in the parking lot" and reasonably believe that Appellees' representation that there had appeared, in the feasibility period, a rippling in a limited portion of the parking lot. The contract provision's generic language is without scope or limit— plainly declaring that the parking lot contains defects. We acknowledge that a direct

contradiction may be found when the representation and the writing are not exactly the same. *Orca Assets*, 546 S.W.3d at 659. But it is too much to say that the words "there are defects in the parking lot" directly contradict a representation of an "alligatoring" defect somewhere in the parking lot.

The "red flags" in the record do not permit Appellant as a sophisticated buyer to ignore them with impunity. While direct contractual contradictions focus on specific language and the accompanying representations, "red flags" reflect general circumstances that warn a party of the risks of the transaction that they are about to enter. *Orca Assets*, 546 S.W.3d at 655. "Red flags" must also be viewed with an eye to the parties' relative levels of sophistication. *Id.* at 656.

Courts identify "red flags" in both the language of a contract and the parties' actions surrounding a contract. For example, in *Orca Assets*, a seller made ambiguous representations about whether it had good title to the property it was selling. *Id.* The buyer had contractually agreed to verify exactly what the seller owned. *Id.* at 657. Upon the execution of the letter of intent, the buyer ceased checking property records for newly filed leases, and three days later a lessee recorded its previous lease with the seller. *Id.* The court found these things to be "red flags" that supported a lack of justifiable reliance as a matter of law. *Id.* at 660. Other "red flags" can involve whether the allegedly defrauded party exercised diligence. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (holding that plaintiff's decision to enter into transaction without undertaking additional investigation into tax consequences was not justifiable, given his access to professional accountants, the amount of money involved, and the ambiguous nature of the pertinent representation); *Orca Assets*, 546 S.W.3d at 657 ("And by the very terms of the letter, Orca had taken upon itself to verify exactly what the trust owned."). An arm's length transaction that results in something other than a form

16

agreement can be a "red flag." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 501 (Tex. 2019).

Appellees' second motion for summary judgment directs us to at least three "red flags" and/or express contract provisions: the parking lot clause, the as-is clause, and the due diligence/investigation clauses. The identification of actual alligatoring in the parking lot is a fourth. Our cumulative analysis of these "red flags" is framed with two overarching facts: that Appellant concedes that it is a sophisticated purchaser of real property, and that Appellant does not contest that the contract was drafted after an arm's-length negotiation.

First, the parking lot clause may not contain a direct contradiction, but its presence—particularly as a product of negotiation—is a clear acceptance of risk by Appellant that directs the buyer's attention to the parking lot as a potential issue. A statement that "there are defects in the parking lot" may not point out all the defects in specificity and scope, but such a clause clearly puts Appellant on notice that the parking lot is a source of risk that Appellant is accepting when it signs off on the purchase of this multi-tenant commercial property.

Second, Appellant agreed that it would take the property, not excluding the parking lot, "as is." Usually, a valid as-is clause can negate justifiable reliance on its own, but an exception exists when fraudulent representation or concealment of information procures the otherwise valid disclaimer. *Prudential*, 896 S.W.2d at 161. Appellant's actual knowledge of the major defects, coupled with the true but allegedly misleading disclosure of the smaller defect, raises a potential exception. Though we do not hold that the as-is clause alone is determinative, it cannot be overlooked. In light of the inclusion of an as-is clause, the Texas Supreme Court observed that "[t]he sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself. He has agreed to take the full risk of determining

17

the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect." *Prudential*, 896 S.W.2d at 161. Such a clause warrants the careful investigation that apparently Appellant neglected, particularly when combined with the other relevant and agreed-to contractual provisions in the Purchase and Sale Agreement.

Third, Appellant—through the due diligence/investigation clauses—unequivocally assumed the responsibility to inspect and investigate the condition of the parking lot. Appellant was on notice that this parking lot was, in part, defective. Importantly, when a buyer has knowledge of existing issues but chooses not to exercise due diligence to inquire more about the details of those issues, they cannot justifiably rely on an alleged failure to disclose for purposes of claiming fraud or negligent misrepresentation. *Rich v. Olah*, 274 S.W.3d 878, 887–88 (Tex. App.—Dallas 2008, no pet.). "We find in the record that [Appellant] did not exercise due diligence by *assuming*" that there were no further parking lot issues. *See Tukua Investments*, 413 S.W.3d at 801 (emphasis added); *see also Rich*, 274 S.W.3d at 887–88. Again, there is no evidence that Appellant made a reasonable attempt to inspect, investigate, or obtain further information.

These "red flags" paint a clear picture: with the knowledge that it had affirmatively been represented that the parking lot was defective, Appellant traded risk for a better price. By purchasing a property "as is," the buyer negotiates a lower price, but also accepts the risk that the property is worth less than the price paid. *Prudential*, 896 S.W.2d at 161. Appellees' nondisclosure did not excuse Appellant from reasonable diligence. "[A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (per curiam) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). As previously noted,

a reasonable search may or may not have uncovered the full extent of the defects. But viewing the "circumstances in their entirety while accounting for the parties' relative levels of sophistication," Appellant's failure to demonstrate any investigation at all belies claimed reasonable reliance on Appellees' alleged misrepresentation by sharing a partial truth. *See Orca Assets*, 546 S.W.3d at 656. Even if we held that there was a relevant duty or a misrepresentation, which we do not, reliance, under these circumstances and in light of the negotiated provisions of purchase and sale agreement by sophisticated parties was simply not warranted. As a sophisticated business entity, Appellant accepted the additional risk in the "as is" clause and the additional responsibility in the "investigation" clause. Despite being put on alert by warnings in the non-boilerplate parking lot clause and by identified physical defects, Appellant failed to perform the accepted duties of basic investigation and inspection to which it acquiesced in the contract. Appellant's assumptions under the circumstances as to the overall condition of the parking lot were not warranted, and we cannot find that a material misrepresentation or justifiable reliance, as asserted by Appellant, exists as a matter of law. We overrule Appellant's second issue.

III. *No Breach of Contract*

In its third issue, Appellant argues that Appellees failed to negate an element of Appellant's breach of contract claim in their second motion for summary judgment. Appellant asserts that, as to the defects in the parking lot, Appellees breached the contract by failing to provide written notice of a "major loss" as per the terms of the contract.

A plaintiff asserting a breach of contract claim must prove (1) the existence of a valid contract; (2) that plaintiff performed or tendered performance as the contract required; (3) that defendant breached the contract by failing to perform or

19

tender performance as the contract required; and (4) that plaintiff sustained damages as a result of the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). Appellees, as the summary judgment movants, had the burden to disprove one of the above elements as a matter of law. In their second motion for summary judgment, Appellees asserted that they did not breach the contract because they had no disclosure obligations under the terms of the contract. When we interpret a contract, we begin with the contract's express language. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022). We interpret the contract in its "plain, grammatical, and ordinary" meaning unless the instrument shows the parties used the terms in a technical sense, or a plain interpretation would "clearly defeat the parties' intentions." *Nettye Engler*, 639 S.W.3d at 690.

Specifically, Appellant argues that Appellees breached section 13.2(b) of the Purchase and Sale Agreement when they failed to provide written notice of a "major loss" as required by the contract. Section 13.2(b) of the parties' contract reads as follows:

> 13.2 **Risk of Loss**. *Before the Closing*, the risk of any loss or destruction of all or any part of the Property is upon Seller. After the Closing, the risk of any loss or destruction of all or any part of the Property is upon Buyer.
>
> . . . .
>
> (b) Major Damage. In the event of a "major" loss or damage, Buyer may terminate this Agreement by written notice to Seller. If Buyer does not elect to terminate this Agreement within ten (10) days after Seller sends Buyer written notice of the occurrence of major loss or damage detailing the damage, the cost to repair and/or refurbish such damage, the time to complete such repairs, and warranting to Buyer whether the loss/damage is covered by any insurance policy, all in the professional third-party estimation of a duly

licensed architect (or engineer), then Buyer shall be deemed to have elected to proceed with Closing . . . .

(Emphasis added). In context, Section 13.2 begins with the words "Before the Closing." Before the closing is a reference to the time period between signing of the Purchase and Sale Agreement and the formal closing of the sale which is typically conducted by a closing agent. The risk-of-loss clause addresses the parties' responsibility for losses that occur within that interim period of time. Appellant's interpretation of "major loss" is not based on the plain language of the contract, nor is it consistent with the context of the phrase "Before the Closing." The definition of "major loss or damage" in the contract is:

> For purposes of Section 13.2(a) and 13.2(b), "major" loss or damage refers to the following: (i) loss or damage to the Property or any portion hereof such that the cost of repairing or restoring the premises in question to a condition substantially identical to that of the premises in question prior to the event of damage would be, in the certified opinion of an architect (or engineer) reasonably acceptable to Seller and Buyer, equal to or greater that Two Hundred Fifty Thousand No/100 Dollars ($250,000.00) for any loss.[6]

Appellant discusses the cost of the damage, which is undoubtedly above $250,000, but glosses over the fact that the defects in the parking lot are not the result of an "event of damage." The parking lot's defects, present from the moment of its imperfect creation, do not comport with a plain reading of an "event of damage." Appellant fails to explain how the parking lot can be restored to its condition "prior to the event of damage," when this parking lot never existed in such a condition *or* was in the same or similar condition at the time that the initial Purchase and Sale Agreement was signed. We agree with Appellees that they proved as a matter of

---

[6]Despite the numbered (i) notation, Section 13 ends immediately after the quoted language without an (ii) or other phrase or paragraph following it.

21

law that they did not breach Section 13.2 of the parties' contract by failing to disclose the extent or magnitude of the preexisting parking lot issues in writing. The risks allocated by the terms of the contract placed no such requirement upon Appellees. Appellant's third issue is overruled.

Because the claims of fraud and breach of contract fail as a matter of law, we do not reach Appellant's remaining issues (Issues Four and Five) related to derivative liability and contractual release of personal liability, respectively, that are dependent upon a viable fraud and/or breach of contract cause of action. *See* TEX. R. APP. P. 47.1

*This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


May 18, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.